# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 07-2946

_____

| | | |
|---|---|---|
| Clifford Charles Fowler, | * | |
| | * | |
| Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Western District of Missouri. |
| Larry Crawford; Steve Long; | * | |
| Dave Dormire; Arthur Wood; | * | |
| Robert Joe Gibson; Missouri | * | |
| Department of Corrections, | * | |
| | * | |
| Appellees. | * | |

_____

Submitted: April 14, 2008
Filed: July 25, 2008

_____

Before GRUENDER, BALDOCK,[1] and BENTON, Circuit Judges.

_____

BALDOCK, Circuit Judge.

This appeal requires us to consider Missouri state prison officials' decision to deny inmate Clifford Fowler a sweat lodge in which to practice his Native American faith. Fowler claims prison officials' refusal to grant him such access violates § 3(a)

_____

[1]The Honorable Bobby R. Baldock, United States Court of Appeals for the Tenth Circuit, sitting by designation.

of The Religious Land Use and Institutionalized Persons Act (RLUIPA). See Pub. L. No. 106-274, § 3(a), 114 Stat. 804 (2000) (codified at 42 U.S.C. §§ 2000cc-1). Subsection 3(a) of RLUIPA provides in relevant part:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person –
>> (1) is in furtherance of a compelling governmental interest; and
>> (2) is the least restrictive means of furthering that compelling governmental interest.

In a thorough opinion, the district court granted summary judgment to prison officials. See Fowler v. Crawford, No. 05-4212-CV-C-NKL, 2007 WL 2137803 (W.D. Mo. July 23, 2007) (unpublished).[2] The court concluded it was bound by our decision in Hamilton v. Schiro, 74 F.3d 1545 (8th Cir. 1996), and held prison officials' "denial of a sweat lodge to [Fowler] is in furtherance of a compelling governmental interest in safety and security in maximum security prisons and is currently the least restrictive means to ensure such safety and security." Fowler, 2007 WL 2137803, at *8. Our jurisdiction arises under 28 U.S.C. § 1291. On appeal we apply the same summary judgment standard as the district court, viewing the evidence in a light most favorable to Fowler and giving him the benefit of all reasonable inferences to be drawn therefrom. See Buboltz v. Residential Advantages, Inc., 523 F.3d 864, 867-68 (8th Cir. 2008). Applying this standard, we affirm.

---

[2]The Honorable Nanette K. Laughery, United States District Court for the Western District of Missouri.

I.

Fowler, of Cherokee descent, is an inmate at the Jefferson City Correctional Center (JCCC). Fowler is serving a life sentence without the possibility of parole for second-degree murder. See Fowler, 2007 WL 2137803, at *2. JCCC is a maximum security prison operated by the Missouri Department of Corrections (MDOC). JCCC houses nearly 2000 adult male inmates. The inmates have been convicted of committing serious felonies, or acts of violence while incarcerated. Over 200 of JCCC's inmates are serving life without parole. The average sentence at JCCC is twenty to thirty years imprisonment. See Joint Appendix at 76 (hereinafter JA).

Presently, JCCC permits Fowler and other inmates who practice the Native American faith to hold a two hour meeting twice weekly in the prison chapel. As part of their meetings, JCCC permits the group, comprised of roughly six inmates, to possess a "sacred bundle." The sacred bundle consists of a prayer pipe, sage, cedar, sweetgrass, tobacco, a medicine bag, and prayer feathers. See JA at 43.

Because of Native Americans' affinity with the Earth, Fowler has requested access to an outdoor area in which to facilitate his group's bi-weekly meetings. See JA at 44. Prison officials are willing to accommodate Fowler's request. Both JCCC's Superintendent and Associate Superintendent, Defendants Dave Dormire and Arthur Wood respectively, are "currently" and "actively" working with JCCC's Chaplain, Defendant Robert Gibson, to secure an outdoor meeting area for JCCC's Native American group. See JA at 74, 78, 84. Fowler claims, however, that an outdoor meeting area is not enough. Specifically, Fowler demands within such area access to a sweat lodge a *minimum* of 17 times a year: "I want the sweat lodge a minimum – basically a minimum of 17 times a year, that's once a month. And then once for each solstice and equinox, and once for a yearly celebration." JA at 44.

When asked about the use of an outdoor area in which to practice his Native American faith, Fowler insisted a sweat lodge was essential to practicing his faith:

Q.    You mentioned in your complaint that you also wanted an outdoor area, at least, to practice your Native American beliefs in. If you didn't get a sweat lodge as part of that outdoor area, would you still be able to practice your religion in the outdoor area?

A.    I wouldn't be able to – to pray to the Great Spirit.

Q.    Okay. Would that be better than your current chapel area to practice your beliefs, an outdoor area?

A.    Are you asking if I had an outdoor area, would that be better than nothing at all? Is that basically –

Q.    Better than what you currently have?

A.    I'm sure that it would be somewhat better, but it still wouldn't enable me to pray for the Great Spirit.

Q.    You need the sweat lodge in order to do that?

A.    Yes. I need to be able to purify in the sweat lodge in order to properly use the sacred pipes to pray for the Great Spirit.

JA at 48-49. Fowler acknowledges that JCCC prison officials "are working to create an outdoor area for Native American group religious practice during regularly scheduled meetings," but "[s]uch an area is not a substitute for the sweat lodge, which [Fowler's] beliefs require." Supplemental Joint Appendix at 253 (hereinafter SJA).[3]

---

[3]Absent a sweat lodge, Fowler also rejects the idea of a medicine wheel (also referred to in the record as a "prayer circle") in the outdoor area:

> A medicine wheel is a sacred thing, constructed upon ground considered/designated as being sacred. It is a large altar, and anyone who enters into or near it must be ritually purified through the sweat lodge ceremony. To construct a medicine wheel in an area designated for Native American religious practice, while denying use of a sweat lodge, would be to desecrate one ceremony for lack of the other.

To fully appreciate the nature of Fowler's request, a detailed description of a sweat lodge and the security concerns it engenders in an institutional setting is necessary.

Willow poles form the structure of a sweat lodge. Participants place several poles, 1½ inches in diameter and 14-16 feet long into the ground and bend them to create a domed structure held together by a small cord.[4] The size of the completed lodge is approximately 4 feet high and 8-10 feet wide, accommodating 12-15 individuals. Blankets or tarps cover the entire structure to contain heat and dark. In the center of the lodge, a depression approximately 3 feet wide and 2 feet deep is designed to hold several cantaloupe-sized rocks. The dirt from the depression is placed outside the entrance of the lodge to form an altar mound. See JA at 44-48; SJA at 128-29.

Directly beyond the altar mound is a fire pit. The pit rests 12-15 feet outside the lodge's entrance and measures approximately 5-6 feet by 4 feet. Firewood is stacked in the pit. The rocks are placed on the firewood and the wood is lit. Once the rocks are hot, a participant carries 7-10 rocks, depending on their size, to the lodge entrance with a shovel or pitchfork. The ceremony's facilitator receives the hot rocks using a pair of deer antlers and places them in the depression at the center of the lodge. See JA at 45-48; SJA at 128-29, 133.

A sweat lodge typically consists of four rounds. Participants enter the lodge wearing only shorts, or a towel wrapped around their waist. A round begins when the

---

Something which I will not do.
SJA at 531.

[4]A sweat lodge takes 4-5 hours to construct. According to Fowler, JCCC's Native American group would construct the sweat lodge using two shovels, two post hole diggers, one pick, and one handsaw. The structure is designed to last four years. See JA at 45; SJA at 133. A detailed description of the construction process appears at pages 132-33 of the SJA.

hot rocks are placed in the depression and the doorway flap is closed. The facilitator intermittently pours water containing sage, cedar, and/or sweetgrass over the rocks to produce steam, heat and humidity. During each round, the participants engage in a prescribed set of songs and prayers. Participants may smoke the ceremonial pipe during the round. See JA at 45-48; SJA at 128-29.

A round takes from 30 minutes to an hour to complete. Upon completion of a round, the doorway flap is raised and additional hot rocks and water are brought into the lodge. A new round then begins. The typical number of rocks used during the ceremony is 30-40. The entire ceremony typically takes 6-7 hours to complete. To conclude the ceremony, participants exit the lodge and remove the blankets or tarps from the willow pole structure. The fire is burned down and sacred objects are stored for safekeeping. The lodge's skeletal structure remains standing. See JA at 44-48; SJA at 128-29.

JCCC prison officials do not question the sincerity of Fowler's request for a sweat lodge. Nor do they challenge the proposition that their decision to deny Fowler a sweat lodge substantially burdens the exercise of his religious faith. See Fowler, 2007 WL 2137803, at *3. Numerous officials, however, have offered a myriad of reasons why they believe Fowler's request for a sweat lodge compromises security at JCCC to an unacceptable degree.

Defendant Wood, JCCC's Associate Superintendent, submitted an affidavit attesting that incidents of violence have occurred at JCCC "during call-out times for religious services." JA at 77. Wood stated that religious groups, like the Native American group at JCCC, "who do not have regular volunteers" from outside the prison to oversee their ceremonies, pose a particular risk because meeting times may

be used for inappropriate purposes:[5] "Offenders, for instance, have used religious programming time to engage in sexual misconduct and organize violence." JA at 77; see also SJA at 595-98 (discussing specific instances of violence and sexual misconduct during religious services at JCCC's predecessor institution).

In addressing Fowler's request for a sweat lodge, Defendant Wood explained: "The sweat lodge ceremony, in which offenders gather in an enclosed area screened from the view of those outside the lodge, and during which offenders tend a fire, handle firewood and large hot rocks, create hot steam, and use tools, including shovels, poses a significant security risk." JA at 77. Wood cited the risk of sexual misconduct, physical assault, and drug use, as well as fire and heat-related safety concerns.[6] Wood also explained that the sweat lodge would "consume considerable institutional financial and personnel resources" and "expend many institutional personnel hours." JA at 78. Finally, Wood indicated that extending unique privileges such as a sweat lodge to one group of inmates to the exclusion of others creates a risk

---

[5]The 2003 version of MDOC's Institutional Services Policy and Procedural Manual defines a Volunteer as "[a] person who performs assigned duties in the department without monetary or material compensation from the department, following the prescribed application, interview, training and site orientation process." SJA at 153. JCCC's Chaplain, Defendant Gibson, has been unable to locate a volunteer familiar with the Native American faith to oversee the Native American group meetings at JCCC. Defendant Gibson has contacted both Gayl Edmunds of the Heart of America Indian Center in Kansas City, and Dolores Santha, a former volunteer for the Native American group at MDOC's Potosi Correctional Center. Neither Edmunds nor Santha was able to provide Defendant Gibson with any information regarding possible Native American volunteers in the Jefferson City area. See SJA at 371.

[6]Indeed, in their proposal to JCCC for a sweat lodge, the Native American group indicated that "[d]ue to extreme heat and humidity associated with the sweat lodge ceremony, participating . . . inmate offenders will sign a statement releasing [MDOC] from any and all liability prior to participation." SJA at 129.

of resentment among the inmate population leading to the potential for unrest and disturbance.  See JA at 77-78.

Fellow MDOC officials reiterated Defendant Wood's concerns about operating a sweat lodge at JCCC.  Defendant Steve Long, Director of Rehabilitative Services, described his concern over the objects used during a sweat lodge, namely rocks, willow poles, shovels, deer antlers, and split wood, all of which could be used as weapons:  "We just try not to issue things like that to the [inmate] population if we don't have to."  JA at 27.  Defendant Long described a sweat lodge as fraught with risk.  See SJA at 461-63.

Notably, MDOC's Potosi Correctional Center (PCC) at one time authorized a by-yearly sweat lodge ceremony only to discontinue it later.  PCC is a maximum security prison half the size of JCCC.  Donald Roper, PCC's Superintendent, stated that PCC discontinued operating the sweat lodge in 2006 due to increasing security concerns amidst a guard stabbing at the prison.  See JA at 51.  At his deposition, Roper expressed ongoing concerns over staffing issues, budget cuts, inmate screening, and the security challenges posed by the sweat lodges' dark confines.  See JA at 68-72.  Terry Moore, MDOC Director of the Division of Adult Institutions, likewise expressed his discomfort with a sweat lodge.  When asked about the possibility of installing a security camera inside the lodge to monitor the participants' conduct, Moore explained the interior of the lodge was dark and, in any event, the steam from the rocks would fog a security camera's lens.  See SJA at 458.  When asked about the feasibility of once again accommodating a sweat lodge at PCC, Roper responded that if court-ordered, he would do so:

> I'm sure that we could make adjustments and probably accommodate a sweat lodge.  Is it a good situation?  Absolutely not.  Is there security concerns?  Absolutely.  Would my chief of custody, my major, would he have a runaway [i.e., be upset]?  Yes, he would.  He would write me memos and point out to me all the safety and security concerns that he

-8-

continuously had when the sweat lodge existed. And . . . now that it doesn't exist, he would say the same thing, that there is a tremendous amount of security concerns that evolved around the sweat lodge.

JA at 70. Roper emphasized: "I'm telling you, I'm here, I've been here, I've done this, and it has the potential to be a problem." JA at 71

Even Defendant Gibson, JCCC's Chaplain, expressed serious concerns about accommodating a sweat lodge. Gibson worried about what might occur inside the lodge and outside the view of prison security. He cited the physical well-being of the participants, as well as the possibility of sexual improprieties and drug use: "[T]here's no way to know what goes on in there." SJA at 479. Gibson supported the idea of an outdoor area where members of JCCC's Native American group would be permitted "to smudge, to smoke pipe and [do] those kinds of things . . . central to all tribes."[7] "That's what I support, because it's viewable, you can monitor it from any number of locations and I'm not as concerned with any kind of inappropriate activity . . . ." SJA at 480.

## II.

As we noted at the outset, Fowler asserts JCCC officials' refusal to accommodate his request for a sweat lodge 17 times a year violates § 3(a) of RLUIPA. See 42 U.S.C. § 2000cc-1(a). RLUIPA is a direct congressional response to the Supreme Court's decision in City of Boerne v. Flores, 521 U.S. 507 (1997). The Court in that case held RLUIPA's predecessor, The Religious Freedom Restoration Act (RFRA), Pub. L. No. 103-141, 107 Stat. 1488 (1993) (codified at 42 U.S.C. § 2000bb - 2000bb-4), unconstitutional as applied to the States because it exceeded

_____

[7]Smudging involves the burning of plants considered sacred, such as sage, cedar, sweet grass, and tobacco or a tobacco blend called kinni-kinnick. Prior to a Native American religious ceremony, the smoke from these burning plants is waved, using a feather, over the participants, the sacred items to be used, and the area in which the ceremony will be performed. See SJA at 122.

Congress' Fourteenth Amendment remedial powers. See City of Boerne, 521 U.S. at 529-36. Section 3 of RFRA broadly provided the Government could substantially burden a person's exercise of religion only upon demonstrating that application of the burden furthered a compelling governmental interest and was the least restrictive means of furthering that interest. See 42 U.S.C. § 2000bb-1 (invalidated by City of Boerne).

Because RLUIPA essentially resurrected RFRA's language (while invoking congressional authority under the Spending and Commerce Clauses), we concluded in Murphy v. Missouri Dep't Corr., 372 F.3d 979, 987 (8th Cir. 2004) that the RLUIPA standard we would henceforth apply in the prison context was identical to the RFRA standard we had previously applied under RFRA:

> Although the legislative history is brief, several factors cause us to conclude that Congress intended that the language of [RLUIPA] is to be applied just as it was under RFRA. Congress did not intend to overly burden prison operations, but rather intended to provide as much protection as possible to prisoners' religious rights without undermining the security, discipline, and order of those institutions.

The following year, the Supreme Court agreed with our view while rejecting an Establishment Clause challenge to RLUIPA. In Cutter v. Wilkinson, 544 U.S. 709 (2005), the Court recognized that "[t]o secure redress for inmates who encountered undue barriers to their religious observations, Congress [in RLUIPA] carried over from RFRA the 'compelling governmental interest'/'least restrictive means' standard." Id. at 717. The Court repeatedly pointed out, however, that lower courts in applying that standard must remain mindful of context: "Lawmakers anticipated . . . that courts entertaining complaints under § 3 would accord 'due deference to the experience and expertise of prison and jail administrators.'" Id. The Court cautioned against construing RLUIPA to elevate accommodation of religious practice over an institution's need to maintain order and safety:

-10-

We have no cause to believe that RLUIPA would not be applied in an appropriately balanced way, with particular sensitivity to security concerns. While the Act adopts a "compelling governmental interest" standard, . . . "[c]ontext matters" in the application of that standard. See Grutter v Bollinger, 539 U.S. 306, 327 (2003). Lawmakers supporting RLUIPA were mindful of the urgency of discipline, order, safety, and security in penal institutions. See, e.g., 139 Cong. Rec. 26190 (1993) (remarks of Sen. Hatch). They anticipated that courts would apply the Act's standard with "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." Joint Statement 16699 (quoting S. Rep. No. 103-111, at 10) [Joint Statement of Sen. Hatch and Sen. Kennedy on RLUIPA appearing at 146 Cong. Rec. 16698, 16699 (2000)].

Cutter, 544 U.S. at 722-23 (internal footnotes omitted). Lest doubt remain, the Court repeated its message a final time: "It bears repetition . . . that prison security is a compelling state interest, and that deference is due to institutional officials' expertise in this area." Id. at 725 n.13.

That brings us to our decision in Hamilton v. Schriro, 74 F.3d 1545 (8th Cir. 1996), which, although decided under RFRA, is markedly similar to the case now before us. Indeed, the district court opined that "no reasonable judge could distinguish this case from Hamilton." Fowler, 2007 WL 2137803, at *8. In Hamilton, prison officials appealed from a grant of injunctive relief to an inmate. We held that RFRA did not mandate inmate access to a sweat lodge at PCC, and reversed the district court:

[T]he lower court got off on the wrong foot by not giving appropriate deference to the decisions of prison administrators and appropriate recognition to the peculiar and restrictive circumstances of penal confinement. . . . [J]udgments regarding prison security are peculiarly within the province and professional expertise of corrections officials,

-11-

and in absence of *substantial* evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.

Hamilton, 74 F.3d at 1553 (internal quotations omitted).[8]  We reasoned that despite RFRA's "strict scrutiny" standard, the Act's legislative history plainly revealed that "context matters:"  "[A] court applying RFRA must give due deference to the expertise of prison officials in establishing regulations to maintain prison safety and security, even when the court applies a heightened standard of review."  Id. at 1554.

The concerns surrounding a sweat lodge that prison officials expressed in Hamilton are identical to those JCCC officials expressed in this case.  See id. at 1548-49.  Like here, prison officials in Hamilton appeared amenable to inmates of the Native American faith meeting outdoors in plain view of security to pray and conduct ceremonies.  See id. at 1556.  Much like Fowler asserts in this case, however, Hamilton asserted that "if he could not have access to a sweat lodge ceremony, he would not and could not practice any aspect of his religion."  Id. at 1548.  Given Hamilton's position, we concluded that his case presented us with –

> the unusual situation where the government has satisfied the least restrictive means prong by demonstrating that other less restrictive alternatives are not acceptable to plaintiff. . . .  Hamilton's own all-or-nothing position supports the prison officials' contention that an out-right prohibition against a sweat lodge ceremony is the least restrictive means of achieving the compelling interests of prison safety and security in this case.

Id. at 1556.

---

[8]Although the panel split 2-1 in Hamilton, the dissent did not challenge the underlying analysis of Hamilton's sweat lodge claim.  Rather, the dissent took issue with the constitutionality of RFRA.  See Hamilton, 74 F.3d at 1557 (McMillian, J., dissenting) (arguing Congress lacked the power under § 5 of the Fourteenth Amendment to enact RFRA).

III.

Like the district court, we are hard pressed to distinguish Hamilton from this case. By all appearances, Hamilton dictates the outcome here. See South Dakota v. United States Dep't Interior, 487 F.3d 548, 551 (8th Cir. 2007) (recognizing the established rule that a subsequent panel may not overrule a prior panel's decision). As we have seen, that we decided Hamilton under RFRA and Fowler's case arises under RLUIPA is inconsequential. Left with little alternative, Fowler suggests time has been Hamilton's undoing because subsequent to our decision, PCC officials operated a sweat lodge for over a decade without major incident. Seeking to capitalize on PCC officials' exercise of discretion, Fowler first insists that the concerns prison officials raised about operating a sweat lodge at JCCC are not compelling, but rather exaggerated. Fowler then argues that, given PCC's past history, JCCC officials cannot possibly prove an outright ban on a sweat lodge is the least restrictive means of furthering the prison's interest in security.

A.

A prison's interest in order and security is always compelling. See, e.g., Cutter, 544 U.S. 725 n.13; see also Murphy, 372 F.3d at 988 (acknowledging that "MDOC has a compelling interest in institutional security"). Certainly, to ensure prison policies are in furtherance of that compelling interest, officials' security concerns must be "grounded on more than mere speculation, exaggerated fears, or post-hoc rationalizations." S. Rep. No. 103-111, at 10 (1993), *reprinted in* 1993 U.S.C.C.A.N. 1892, 1900 (Senate Report on RFRA). But no reasonable jurist, affording due deference to prison officials, can dispute that serious safety and security concerns arise when inmates at a maximum security prison are provided ready access to (1) burning embers and hot coals, (2) blunt instruments such as split wood and large scalding rocks, (3) sharper objects such as shovels and deer antlers, and (4) an enclosed area inaccessible to outside view. As PCC Superintendent Roper aptly explained: "I'm telling you, I'm here, I've been here, I've done this, and [a sweat lodge] has the

-13-

potential to be a problem." JA at 71. See Lovelace v. Lee, 472 F.3d 174, 190 (4th Cir. 2006) (providing due deference to prison policy restrictions "that take[] into account any institutional need to maintain good order, security, and discipline or to control costs"); see also Coronel v. Paul, 225 F. App'x 575, 577 (9th Cir. 2007) (unpublished) (citing Hawaii prison officials' decision to discontinue sweat lodge ceremonies "because an investigation revealed that Hawaiian prison gangs were using these services as a forum to organize disruption" at the prison).

And this is to say nothing of a sweat lodge's drain on prison security's manpower over the 6-7 hour duration of the ceremony. Such a drain becomes all too real if unrest arises in one part of the prison while a sweat lodge ceremony is ongoing elsewhere. See Al-Alamin v. Gramley, 926 F.2d 680, 686 (7th Cir. 1991) ("Prison administrators . . . have limited resources to provide the services they are called upon to administer."). Prison officials need not endure assaults, drug indulgence, or sexual improprieties before implementing policies designed to prevent such activities in an uneasy atmosphere. Nor do prison officials charged with managing such a volatile environment need present evidence of actual problems to justify security concerns. See Murphy, 372 F.3d at 989. The record before us well documents JCCC officials' legitimate fears surrounding a sweat lodge. On this record, we have no difficulty concluding JCCC officials met their burden under § 3(a)(1) of RLUIPA and established, as a matter of law, that prohibiting a sweat lodge at JCCC is in furtherance of a compelling governmental interest. See 42 U.S.C. § 2000cc-1(a)(1).

B.

Fowler takes more forceful aim at § 3(a)(2) of RLUIPA, the least restrictive means component. See 42 U.S.C. § 2000cc-1(a)(2). He initially asserts the district court improperly placed the burden on him to establish a sweat lodge ban was not the least restrictive means by which to alleviate officials' security concerns. See id. § 2000cc-2(b) (placing the burden on the Government to establish a compelling governmental interest served by the least restrictive means). Fowler's argument is

-14-

unavailing. The record before us plainly reveals that JCCC officials suggested alternatives to and sought a compromise with Fowler, to no avail. They offered Fowler an outdoor area where he may smoke the ceremonial pipe and practice other aspects of his Native American faith in open view. See JA at 74, 78, 84. Officials suggested a medicine wheel. See SJA at 531. They sought to locate an outside volunteer to oversee JCCC's Native American group. See SJA at 371.[9] See Spratt v. Rhode Island Dep't Corr., 482 F.3d 33, 41 n.11 (1st Cir. 2007) (suggesting that "to meet the least restrictive means test, prison administrators generally ought to explore at least some alternatives"). Nonetheless, Fowler has rejected anything short of a sweat lodge a *minimum* of 17 times a year, insisting JCCC utilize whatever resources and screening procedures are necessary to meet his demand. See JA at 44; see also Aplt's Reply Br. at 2 n.1 (stating Fowler would accept additional guard supervision, including a guard inside the lodge).

Fowler also belatedly asserts that his request for a transfer to PCC, at a time when that prison was accommodating a sweat lodge twice yearly with numerous staff-imposed restrictions, illustrates his willingness to accept something less than what he ostensibly demands. But apart from Fowler's transfer request, we can find nothing in the record to suggest that Fowler had any actual knowledge of the restrictions PCC placed on the sweat lodge ceremony, including its frequency. Besides, Fowler surely knows more about the practice of his Native American faith than JCCC officials. If he was willing to accept something less than a sweat lodge 17 times a year, he should

---

[9]At the time PCC permitted a sweat lodge, MDOC guidelines on Native American Spirituality provided that "[s]weat lodges *may* be constructed at correctional centers." JA at 173 (emphasis added). Sweat lodge ceremonies, however, "are to be allowed *only* when there is approved external spiritual leadership to lead practices and *only* when all operational considerations are addressed to the satisfaction of the Superintendent." SJA at 173 (emphasis added). Current MDOC policies do not provide for the operation or construction of a sweat lodge at any MDOC institution. See SJA at 378.

have said so in no uncertain terms. Instead, he said exactly the opposite: "I want the sweat lodge a minimum – basically a minimum of 17 times a year . . . ." JA at 44.

Unfortunately for Fowler, the burden of production shifted to him once JCCC officials had come forth with evidence that other means by which Fowler might practice his Native American faith were unacceptable to him. Where a motion for summary judgment is properly made and supported, as JCCC officials did here consistent with their burden of proof, an opposing party must set forth specific facts showing a genuine issue for trial. See Fed. R. Civ. P. 56(e)(2). That Fowler bore the burden of production at this point hardly constitutes an improper shifting of RLUIPA's burden of proof. "It would be a herculean burden to require prison administrators to refute every conceivable option in order to satisfy the least restrictive means prong of RFRA." Hamilton, 74 F.3d at 1556; accord Spratt, 482 F.3d at 41 n.11 (applying RLUIPA).

Fowler's reliance on our decision in Murphy to suggest the district court improperly shifted RLUIPA's burden of proof to him is misplaced. In Murphy, we held prison officials could not meet their burden of establishing that the denial of group worship privileges to Murphy, a white supremacist, was the least restrictive means of furthering their interest in security, where the only evidence officials presented was that Murphy was a racist and his religion limited participation to Anglo-Saxons. Unlike this case, we explained that "[i]t is not clear [whether] MDOC seriously considered any other alternatives, nor were any explored before the district court." Murphy, 372 F.3d at 989.

Of course, our own Justice Blackmun recognized that "[a] judge would be unimaginative indeed if he could not come up with something a little less 'drastic' or a little less 'restrictive' in almost any situation, and thereby enable himself to vote to strike [regulation] down." Illinois State Bd. Elec. v. Socialist Workers Party, 440 U.S. 173, 188-89 (1979) (Blackmun, J., concurring) (criticizing the least restrictive means test as a "slippery slope" of uncertainty). But such a draconian construction of

-16-

RLUIPA's least restrictive means test would render federal judges "the primary arbiters of what constitutes the best solution to every religious accommodation problem" in state penal institutions. Lovelace, 472 F.3d at 215 (Wilkinson, J., dissenting).[10] And, as we have seen, this would be inconsistent with congressional intent. See Cutter, 544 U.S. at 722-23.

We must remain mindful that Cutter counsels restraint in this realm. There, the Supreme Court repeatedly instructed us to provide "due deference to the experience and expertise of prison and jail administrators" in construing RLUIPA. Id. at 723. Otherwise, "religious accommodation in the penological context threatens to become the tail that wags the dog. Absent due restraint, 'inmate requests for religious accommodations [may] become excessive, impose unjustified burdens on other institutionalized persons, or jeopardize the effective functioning of an institution.'" Lovelace, 472 F.3d at 217 (Wilkinson, J., dissenting) (quoting Cutter, 544 U.S. at 726).

Undeterred, Fowler insists that JCCC officials have not established that an outright sweat lodge ban is the least restrictive means of ensuring prison safety and security. Again, Fowler cites PCC's previous operation of a sweat lodge essentially to conclude "they did it at PCC, they can do it at JCCC." Given the obvious security concerns surrounding the sweat lodge itself, we are loathe to suggest that had Fowler shown some willingness to soften his demand the outcome of this case might differ. Courts have repeatedly recognized that "evidence of policies at one prison is not conclusive proof that the same policies would work at another institution." Spratt,

---

[10]Nor is this a view of federalism we wish to endorse. We cannot "imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with states laws, regulations, and procedures, than the administration of its prisons." Woodford v. Ngo, 548 U.S. 81, 94 (2006); see also Hamilton,73 F.3d at 1553 ("[W]here state penal institutions are involved, federal courts have a further reason for deference to the appropriate prison authorities." (internal quotations omitted)).

482 F.3d at 42. In Hamilton, we acknowledged deposition testimony from prison administrators in other states that their respective institutions conducted sweat lodge ceremonies without major problems. Hamilton, 74 F.3d at 1548. Yet that was not enough for us to strip PCC officials of their discretion in deciding whether to accommodate inmates of the Native American faith with a sweat lodge.[11]

Of course, this is not to say that evidence of what other prisons have done to accommodate inmates' religious practices is irrelevant to our inquiry. See Washington v. Klem, 497 F.3d 272, 285 (3d Cir. 2007). But as prisons differ, so may the means by which prison officials ensure order and stability:

> Although prison policies from other jurisdictions provide some evidence as to the feasibility of implementing a less restrictive means of achieving prison safety and security, it does not outweigh the deference owed to the expert judgment of prison officials who are infinitely more familiar with their *own* institutions than outside observers.

Hamilton, 74 F.3d at 1557 n.15 (emphasis added). The point is that prison officials may, quite reasonably, exercise their discretion differently based upon different

---

[11]Similarly, the Sixth Circuit in Hoevenaar v. Lazaroff, 422 F.3d 366 (6th Cir. 2005) rejected an inmate's demand to wear a kouplock as part of his religious faith despite evidence that earlier prison regulations had permitted individualized exceptions to hair style without incident:

> Although the district court noted that the prison did not produce data demonstrating that the pre-1991 use of discretionary exceptions to prison regulations resulted in more dangerous prisons, the testimony of [Major] Guyton and Warden Lazaroff was sufficient to demonstrate that individualized exceptions did not sufficiently protect the state's interest in security and safety, particularly in light of the deference accorded to the judgment of prison officials regarding prison operations. Hoevanaar did not rebut the state's expert testimony regarding the problems with his suggested alternatives "by substantial evidence" that the officials exaggerated their response to security considerations.

Id. at 371-72.

institutional circumstances.[12] RLUIPA "mandates a uniform test, not a uniform result." Hamilton, 74 F.3d at 1554 (internal quotations omitted).

A holding that RLUIPA requires JCCC to provide Fowler a sweat lodge simply because PCC operated a sweat lodge for a number of years without incident would adversely impact MDOC inmates. In effect, such a result would require every penal institution within MDOC's jurisdiction to accommodate inmates of the Native American faith with a sweat lodge because those institutions' security interests are surely no greater than those of JCCC, the highest level maximum security prison within MDOC. This would discourage prison officials within MDOC from accommodating inmates' religious practices, knowing that if one institution accommodated a particular religious practice, then all institutions would likely have to accommodate the same practice, regardless of the facts and circumstances. For all the foregoing reasons, we conclude JCCC officials met their burden under § 3(a)(2) of RLUIPA and established, as a matter of law, that prohibiting a sweat lodge at JCCC is the least restrictive means by which to further the institution's compelling interest in safety and security. See 42 U.S.C. § 2000cc-1(a)(2).

IV.

In enacting § 3 of RLUIPA, Congress sought to eliminate "frivolous or arbitrary" barriers impeding prisoners' exercise of religion. See Cutter, 544 U.S. at 716. One need not be analytically inclined to discern the difference between the

---

[12]For instance, JCCC's inmate population is over twice the size of PCC's inmate population. Compare JA at 76 (estimating JCCC's inmate population at 1,973) with SJA at 560 (estimating PCC's inmate population at 980). This alone suggests that officials at JCCC may well be unable to accommodate religious practices that PCC may accommodate. Another material difference is that PCC, while operating the sweat lodge, apparently had outside volunteers to oversee its Native American group and maintain the group's focus. JCCC in contrast has been unable to locate such volunteers. Compare JA at 56-57 (deposition of former PCC Volunteer Dolores Santha) with SJA at 371 (affidavit of JCCC Chaplain Robert Gibson).

arbitrary restrictions Congress sought to proscribe with RLUIPA, and JCCC's sweat lodge ban.[13] Providing inmates at a maximum security prison access to burning fires, red hot rocks, split wood, shovels, and deer antlers alone generate a unique and obvious set of security concerns. Add to this an enclosed area engulfed in steam and void of light, outside the view of prison guards, and prison officials' fears are further legitimized. And we must not forget that the sweat lodge ceremony would expend significant prison resources, undoubtedly diverting limited resources from other areas of the prison. Considering all these factors, we find nothing "frivolous or arbitrary" about JCCC's refusal to accommodate Fowler's request for a sweat lodge.

Recall that in Hamilton, we did "not . . . foreclose the possibility of a successful sweat lodge claim *under different circumstances.*" Hamilton, 74 F.3d at 1557 (emphasis added). Indeed, where possible, "we encourage[d] prisons to accommodate the religious needs of inmates, including American Indian inmates." Id. And that is precisely what officials at PCC subsequently did, operating a bi-yearly sweat lodge for Native American inmates until, due to prison unrest, they determined in their discretion that the balance between religious accommodation and prison security

---

[13]For example, congressional hearings revealed some Muslim prisoners complained about the lack of Hallal food that was a necessary part of their religious observance, other Jewish prisoners complained about a lack of sack lunches that would enable them to break their religious fasts after nightfall, still others complained about a ban on lighting Chanukah candles although the prison permitted smoking and votive candles. A clergyman described a year long battle over the use of Sacramental Wine. The same witness explained that some prison officials treated with contempt inmate possessions such as the Bible, the Koran, the Talmud, and Native American sacred objects. Officials reportedly on occasion confiscated, damaged, or discarded these possessions. See Cutter, 544 U.S. at 717 n.5. Case law reveals other seemingly unnecessary restrictions on inmates' religious practices. For instance one inmate, an ordained minister, was not permitted to preach at weekly religious services. See Spratt, 482 F.3d at 35. Another inmate complained that prison officials unduly limited the number of religious books he could possess in his cell, although prison policies allowed him personal property in the amount of four storage boxes. See Washington, 497 F.3d at 285.

tipped in favor of the latter. Similarly, JCCC officials have exercised their discretion and determined that a sweat lodge at JCCC jeopardizes prison safety and security to an unacceptable degree. This is precisely the exercise of discretion to which RLUIPA requires us to defer.

Stripped of rhetoric, the question before us is not whether JCCC officials *may*, but whether they *must,* provide Fowler with a sweat lodge. In other words, the pertinent query is whether a federal appeals court, far removed from the realities of institutional life at JCCC, or state prison officials – well familiar with (1) the size and nature of JCCC's population, (2) the staffing problems and budgetary restrictions under which they labor, and (3) the various religious practices they are asked to accommodate – is best suited to make such a decision. The answer is clear when we distinguish between disputed facts (which are altogether absent here) and disputed matters of professional judgment. When we are presented only with disputes regarding professional judgment, "our inferences must accord deference to the views of prison authorities" where those views rest on more than mere speculation and conjecture. Beard v. Banks, 126 S. Ct. 2572, 2578 (2006) (plurality).

The judgment of the district court is **AFFIRMED**.

_____