**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 19-2737
_____

DAVID M. WATSON,
                              Appellant

v.

GUS CHRISTO, Chaplain;
CORPORAL KATRINA BURLEY, Grievance Committee;
JOSEPH SIMMONS, Food Service Supervisor;
MICHAEL KNIGHT, Food Service Administrator;
MAJOR JOHN BRENNAN, Grievance appeals person;
WARDEN DAVID PIERCE;
JAMES SCARBOROUGH, Deputy Warden;
LIEUTENANT CHRIS SENATO
_____

On Appeal from the United States District Court
for the District of Delaware
(D.C. No. 1-16-cv-00433)
District Judge: Honorable Richard G. Andrews
_____

Argued September 29, 2020
_____

Before: SHWARTZ, PHIPPS, and SCIRICA, <u>Circuit Judges</u>.

(Filed: December 2, 2020)
_____

OPINION[*]
_____

---

[*] This disposition is not an opinion of the full court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

Brian Biggs, Esq. [ARGUED]
Kaitlin M. Edelman, Esq.
Denise S. Kraft, Esq.
Erin Larson, Esq.
DLA Piper
1201 North Market Street, Suite 2100
Wilmington, DE 19801

        Counsel for Appellants

Wilson B. Davis
Stuart B. Drowos, I
George T. Lees, III [ARGUED]
Office of Attorney General of Delaware
Delaware Department of Justice
820 North French Street
Carvel Office Building
Wilmington, DE 19801

Brionna L. Denby
Cohen Seglias Pallas Greenhill & Furman
500 Delaware Avenue, Suite 730
Wilmington, DE 19801

        Counsel for Appellees

SHWARTZ, Circuit Judge.

David Watson sued officials[1] at James T. Vaughn Correctional Center ("VCC") in Delaware (collectively "the prison"), alleging that the prison violated the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1, and the First Amendment by denying his request to possess tefillin, an item used by some Jewish men

---

[1] The defendants involved in this appeal are Chaplain Gus Christo, Corporal Katrina Burley, Major John Brennan, Warden David Pierce, and Deputy Warden James Scarborough because the sole order appealed is the one that denied Watson access to tefillin. Before the District Court, Watson dismissed the claims and parties related to his requests for kosher meals.

2

for weekday prayers. The District Court granted summary judgment in favor of the prison, concluding that denying Watson use of tefillin was the least restrictive means of furthering prison safety and security. Based on this record, which demonstrates the unique components of the tefillin, Watson's behavioral and mental health issues, and the challenges in securing the prison unit in which he is housed, we agree and we will affirm.

I

Following convictions for violent offenses,[2] Watson was incarcerated, classified as a maximum-security inmate, and placed in the Residential Treatment Unit ("RTU"), a segregated unit for inmates with severe mental health needs.[3] Watson has a history of escape, suicide attempts, threatening to hang himself, possession of a razor and sharpened metal objects, and threats to corrections officers. Watson and the other RTU inmates pose a higher security risk than prisoners in other maximum-security units because of their more frequent and unpredictable violent outbursts and attempted suicides. In this volatile environment, staff members must quickly respond to sudden disturbances. The RTU, and VCC in general, are short-staffed.

Watson practices Reform Judaism, and he requested tefillin, a set of small boxes containing parchment with verses from scripture that are attached to thick leather straps

---

[2] In January 2013, Watson was arrested for his participation in shootings at the homes of law enforcement officers. Watson v. State, No. 665, 2013, 2015 WL 1279958, at *2-5 (Del. Mar. 19, 2015). Watson was found guilty of three counts of first-degree reckless endangering, three counts of possession of a firearm during the commission of a felony, one count of second-degree conspiracy, and one count of criminal mischief. Id. at *1. He was sentenced to 101 years' imprisonment. Id. at. *6.

[3] Watson is in the RTU to receive treatment for schizophrenia and bipolar disorder.

3

several feet long. Watson asked to keep tefillin in his cell for weekday morning prayers.

He did not propose any alternative forms of access. The prison educated itself about

tefillin, discussed the security issues it posed (namely, that it could be used for violence,

self-harm, or escape), and denied Watson's request due to those security risks.

Watson sued the prison and, in an amended complaint, alleged that denying him

access to tefillin violated RLUIPA and the First Amendment.[4] In response, the prison

revisited Watson's request for tefillin and considered (1) whether a staff member could

bring Watson tefillin and supervise him while he prayed and (2) whether staff could

escort Watson from the RTU to pray with tefillin in a designated area. The prison

rejected both alternatives because each required diverting staff from other needs and did

not alleviate the risk that Watson could harm himself once given the tefillin. Moreover,

even if the prison had staff available, in the event of an emergency incident—a frequent

occurrence in the RTU—staff members monitoring or escorting Watson would either be

unable to respond to or, potentially worse, would respond to the emergency, leaving

Watson unsupervised. In his deposition testimony, Deputy Warden Scarborough

repeatedly raised his concern about "times where things happen that cause a security

alert, cause our staff to be diverted[,]" and noted that "[i]t will go fine all the way up until

the one time that it doesn't." App. 496. Further, neither accommodation addressed the

fact that tefillin's components pose a danger and a method to smuggle contraband, which

---

[4] Watson also alleged that denying him tefillin violated the Delaware Constitution, but his opening brief does not mention that claim, so he has forfeited any challenge to the dismissal of this state law claim. Khan v. Att'y Gen., 691 F.3d 488, 495 n.4 (3d Cir. 2012).

4

make it risky to secure. Thus, due to staffing constraints and the physical attributes of tefillin, as well as Watson's classification, placement in the RTU, and escape attempt, the prison concluded that it could not accommodate his request.

Thereafter, the prison moved for summary judgment, which the District Court granted. Watson v. Christo, Nos. 16-cv-433-RGA, 17-cv-351-RGA, 2019 WL 1324941, at *2, *7 (D. Del. Mar. 25, 2019). The Court held that, under RLUIPA, the prison had carried its burden of showing that denying Watson tefillin was the least restrictive means of maintaining prison safety and security. Id. at *6. The Court found that (1) tefillin was riskier than other religious objects the prison allowed, (2) the prison's staffing concerns for the demanding RTU were supported by testimony, and (3) other prisons' policies that allowed access to tefillin were inapposite because those policies did not apply to a short-staffed mental health unit, as here. Id. Because the prison met its demanding burden under RLUIPA, the Court held that the prison also met its lesser burden under the First Amendment. Id. Watson appeals.

## II[5]

The parties agree that maintaining prison safety and security is a compelling interest. Id. at *5. The sole issue is whether denying Watson tefillin is the least

---

[5] The District Court had jurisdiction under 28 U.S.C. § 1331, and we have jurisdiction under 28 U.S.C. § 1291.

Our review of a district court's order granting summary judgment is plenary, Mylan Inc. v. SmithKline Beecham Corp., 723 F.3d 413, 418 (3d Cir. 2013), and we view the facts and make all reasonable inferences in the non-movant's favor, Hugh v. Butler Cnty. Family YMCA, 418 F.3d 265, 266-67 (3d Cir. 2005). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "'A dispute is genuine if

restrictive means of furthering that interest.[6] To do so, the prison must "show that it lacks other means of achieving" prison safety and security without burdening Watson's requested religious exercise.[7] Holt v. Hobbs, 574 U.S. 352, 364-65 (2015) (alteration and

---

a reasonable trier-of-fact could find in favor of the nonmovant' and 'material if it could affect the outcome of the case.'" Thomas v. Tice, 948 F.3d 133, 138 (3d Cir. 2020) (quoting Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 300 (3d Cir. 2012)). "We may affirm a district court for any reason supported by the record." Brightwell v. Lehman, 637 F.3d 187, 191 (3d Cir. 2011).

[6] In examining a RLUIPA claim, we may rely on cases that discuss the Religious Freedom Restoration Act ("RFRA") because the same standards apply in RFRA and RLUIPA cases. Burwell v. Hobby Lobby Stores, Inc., 573 U.S. 682, 695 (2014) (The RLUIPA "imposes the same general test as RFRA but on a more limited category of governmental actions.").

Under RLUIPA, Watson bears the "initial burden" of showing that (1) he has a sincerely held religious belief in possessing tefillin, and (2) the prison substantially burdened the exercise of his belief by denying him tefillin. Holt v. Hobbs, 574 U.S. 352, 360-61 (2015); see also 42 U.S.C. § 2000cc-1(a). If he makes that showing, the burden shifts to the prison to show that denying tefillin "(1) [was] in furtherance of a compelling governmental interest; and (2) [was] the least restrictive means of furthering that compelling governmental interest." Holt, 574 U.S. at 362 (alterations in original) (quoting § 2000cc-1(a)). The District Court resolved this case on the least-restrictive-means element because the other elements were either conceded or not appropriate for summary judgment. On the first element, the Court held that there was a genuine dispute of fact over whether Watson's Reform Judaism was sincere. Watson v. Christo, Nos. 16-cv-433-RGA, 17-cv-351-RGA, 2019 WL 1324941, at *4 (D. Del. Mar. 25, 2019). On the second element, the parties agreed that denying tefillin to a practicing Reform Jew would be a substantial burden. Id. On the third element, the parties agreed that prison safety and security were compelling interests. Id. at *5. On appeal, the parties make no arguments regarding the other elements.

[7] We examine the prison's response to an inmate's request. See United States v. Wilgus, 638 F.3d 1274, 1289 (10th Cir. 2011) ("[T]he government's burden is two-fold: it must support its choice of regulation, and it must refute the alternative schemes offered by the challenger, but it must do both through the evidence presented in the record."). Indeed, courts have not required prisons to identify and evaluate "every conceivable option in order to satisfy the least restrictive means prong of RFRA" or RLUIPA. Fowler v. Crawford, 534 F.3d 931, 940 (8th Cir. 2008) (internal quotation marks and citation omitted); see also Ill. State Bd. of Elections v. Socialist Workers Party, 440 U.S. 173, 188-89 (1979) (Blackmun, J., concurring) ("A judge would be unimaginative indeed if he could not come up with something a little less 'drastic' or a little less 'restrictive' in

6

citation omitted). While the prison "must consider and reject other means," <u>Washington</u> <u>v. Klem</u>, 497 F.3d 272, 284 (3d Cir. 2007), RLUIPA does not require prisons to "impose unjustified burdens on other institutionalized persons[] or jeopardize the effective functioning of an institution." <u>Cutter v. Wilkinson</u>, 544 U.S. 709, 726 (2005). Watson argues that denying him access to tefillin is not the least restrictive means of maintaining safety and security either because (1) he could safely possess tefillin or (2) officers could supervise his use of tefillin. Based on this record, however, no reasonable juror could conclude that the prison could feasibly achieve its goal of safety and security while allowing Watson access, supervised or otherwise, to tefillin each weekday morning.

---

almost any situation, and thereby enable himself to vote to strike legislation down."). Thus, a prison is not required to offer ways that would not fully accommodate the religious practice. In fact, we have held that a partial accommodation of a religious request that does not fulfill a prisoner's religious obligation is insufficient under RLUIPA. <u>See</u> <u>Washington v. Klem</u>, 497 F.3d 272, 284-86 (3d Cir. 2007) (holding that a prison's policies that only allowed a prisoner to access roughly fourteen books per week violated RLUIPA because his religion required him to read twenty-eight books per week). Applied here, Watson asked for access to tefillin each weekday morning. The prison evaluated that specific request and was not required to offer an avenue for access that did not fulfill this daily religious obligation without Watson indicating that such an accommodation would have been acceptable. <u>See</u> <u>Fowler</u>, 534 F.3d at 940 ("If [plaintiff] was willing to accept something less than a sweat lodge 17 times a year, he should have said so in no uncertain terms.").

     Here, Watson requested weekday access to tefillin. In response, the prison considered several alternatives to accommodate Watson's request, such as allowing Watson to use tefillin while in the unit or transporting him to the Chapel. The prison determined that each alternative requires committing at least one or two staff members to monitor him each weekday morning. The undisputed record shows that allocating staff to supervise or escort Watson every weekday would leave less manpower to respond to incidents in the RTU. The prison determined that each alternative was not feasible because of the unique dangers posed by tefillin and the RTU's volatile environment.

7

First, the undisputed facts show that allowing Watson access to tefillin poses substantial risks because of tefillin's uniquely risky attributes.[8] Its long leather straps could be used to strangle or restrain others or injure oneself. Moreover, its boxes could be used to smuggle contraband. Thus, no reasonable juror could conclude that an inmate in Watson's position could be allowed access to tefillin without posing a substantial risk to himself and others.[9]

Second, Watson has engaged in behavior that shows his possession of such an object as requested could undermine prison safety and security. See Holt, 574 U.S. at 363 (instructing that courts analyze how granting an accommodation to the particular claimant will affect the prison's interests). Watson is classified as a maximum-security risk based on his sentence, crime, and behavior in prison. Watson's history includes an escape attempt, suicide attempts, possession of prohibited dangerous objects, threats to injure corrections officers, and a threat to hang himself.

---

[8] Watson argues that the prison allows inmates to possess other religious objects that pose security risks, such as necklace chains or prayer rugs, creating a factual issue over whether the prison can safely allow him tefillin. However, tefillin presents multiple unique risks if in the possession of an inmate like Watson, and these other objects do not have similar components and thus are not relevant comparators.

[9] Watson argues that other prisons have safely allowed inmates in similar housing to access tefillin, but policies or conditions at other prisons are "not necessarily controlling." Holt, 574 U.S. at 368 (quoting Procunier v. Martinez, 416 U.S. 396, 414 n.14 (1974)). For example, policies discussed in Searles v. Bruce, No. 01-3379-JTM, 2003 WL 23573643, at *3 (D. Kan. Oct. 20, 2003), and Spigelman v. Samuels, No. 13-CV-074-GFVT, 2015 WL 1411942, at *1 (E.D. Ky. Mar. 26, 2015), which allowed segregated inmates access to tefillin have little relevance here because neither applied to a volatile mental health unit, with a higher risk for misconduct than even maximum-security units, in a short-staffed prison. See Subil v. Sheriff of Porter Cnty., No. 2:04-CV-0257 PS, 2008 WL 4690988, at *4 (N.D. Ind. Oct. 22, 2008) (holding that denying tefillin does not violate RLUIPA).

Third, the RTU is a particularly challenging environment to secure because it houses inmates like Watson who have serious behavioral and mental health issues that result in unpredictable disruptions. See Fowler v. Crawford, 534 F.3d 931, 939 (8th Cir. 2008) (denying request for sweat lodge ceremonies was the least restrictive means of maintaining prison security because, among other things, such ceremonies would divert staff and prevent them from responding to unrest in other areas of the prison).

Finally, when applying RLUIPA, "[c]ontext matters." Cutter, 544 U.S. at 723 (citation omitted). Congress enacted RLUIPA "mindful of the urgency of discipline, order, safety, and security" in prisons, and anticipated courts would give "due deference to the experience and expertise" of prison officials "in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." Id. (internal quotation marks and citations omitted). Thus, Congress recognized that prisons are unique, and their resources are limited. The limited RTU staff[10] must monitor unpredictable inmates who pose security

_____

[10] Watson argues that the prison overstates its staffing concerns because the prison never performed a detailed cost analysis or provided documentary evidence of their staffing concerns, and because Deputy Warden Scarborough testified that, if directed to do so, he could assign staff members to escort Watson. We disagree. First, while "cost may be an important factor in the least-restrictive-means analysis," Hobby Lobby, 573 U.S. at 730, prisons need not produce detailed cost analyses to satisfy their RLUIPA burden, see Cutter v. Wilkinson, 544 U.S. 709, 723 (2005) ("[c]ontext matters" when considering RLUIPA's application). Moreover, here, the reason was not cost but the availability of staff, and thus a cost analysis is not relevant, particularly given the testimony explaining that the staffing shortage stems from challenges in finding people to fill positions. Furthermore, the prison did not need to establish its limited staffing through documentary evidence, and instead properly established those facts through deposition testimony. See Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular

risks. Diverting resources to monitor the activities of one inmate each weekday places the entire unit at risk. Within this context, no reasonable jury could conclude that the prison's decision to bar Watson from having daily access to tefillin is not the least restrictive means to further the compelling interest in maintaining prison security and safety.[11]  See Cutter, 544 U.S. at 726.

---

parts of materials in the record, including depositions . . . .").  Second, while Deputy Warden Scarborough testified that reallocating staff was not impossible, there is no dispute that the prison is understaffed, the RTU houses inmates who are unpredictable, and the requested accommodation would divert two staff members to supervise Watson from responding to RTU incidents.  Thus, the undisputed facts show that the proposed accommodation is not "viable" or "straightforward," Hobby Lobby, 573 U.S. at 728; see also Fowler, 534 F.3d at 939.

While the prison raised concerns about staffing and the District Court found those concerns were valid and supported by testimony, we do not base our holding on the contention that the prison has insufficient staff to implement Watson's proposed accommodations.  Instead, we conclude that neither Watson's initial request to possess tefillin in his cell nor Watson's proposed accommodations achieve the prison's goal of safety and security in the context of the unit in which he is housed.

Our dissenting colleague, nonetheless, asserts that staffing should be considered and that the prison could pay overtime to its existing personnel so that it could provide Watson monitors while he uses the tefillin.  The undisputed testimony reflects that the prison was understaffed, hundreds of overtime hours were being worked, and there were difficulties in recruiting new personnel.  Directing the prison to require its already stretched staff to work overtime to monitor the actions of a volatile inmate who is housed in a unit with unique demands ignores our obligation to consider whether we are directing the prison to bear an "unjustified burden" that could "jeopardize the effective functioning" of the prison as well as the requirement that we "consider[] costs and limited resources."  Cutter, 544 U.S. at 723, 736.

[11] Because we conclude that Watson's RLUIPA claim fails, and the prison's burden is greater under RLUIPA than the First Amendment, see, e.g., Fox v. Washington, 949 F.3d 270, 277 (6th Cir. 2020), his First Amendment claim necessarily fails. Compare Turner v. Safley, 482 U.S. 78, 89 (1987) (explaining that a prison may defeat a First Amendment claim if the prison policy "is reasonably related to legitimate penological interests"), with Holt, 574 U.S. at 352-54 (explaining that a prison may defeat a RLUIPA claim if the prison policy is the "least restrictive means" of furthering a "compelling interest").

10

## III

For the foregoing reasons, we will affirm the District Court's order granting summary judgment in favor of the prison.

*Watson v. Christo*, No. 19-2737
PHIPPS, *Circuit Judge*, dissenting.

David Watson, a Reform Jewish inmate who poses a maximum-security risk,

requested tefillin[1] for use in prayer for fifteen minutes each weekday morning. After his

request was denied, Watson filed suit *pro se* against several officials at the prison, the

James T. Vaughn Correctional Center in Smyrna, Delaware, in their individual and

official capacities (collectively "the prison"). Watson claimed that by denying him

access to tefillin, the prison violated his rights to exercise religion under the Religious

Land Use and Institutionalized Persons Act ("RLUIPA") and the First Amendment. The

prison moved for summary judgment, and the District Court granted that motion. Watson

appealed, and today the Majority Opinion affirms that judgment denying Watson's claims

for access to tefillin.

I respectfully dissent because, on this record, Watson's RLUIPA and

constitutional claims should survive summary judgment, and that requires vacatur and

remand to the District Court for further proceedings.

I. THE PRISON FAILS TO PROVE THAT DENYING WATSON ACCESS TO
TEFILLIN IS THE LEAST RESTRICTIVE MEANS OF ACHIEVING ITS
COMPELLING INTERESTS IN PRISON SAFETY AND SECURITY.

RLUIPA protects the exercise of religion in prison by generally preventing the

government from substantially burdening a prisoner's exercise of religion. 42 U.S.C.

§ 2000cc-1(a) ("No government shall impose a substantial burden on the religious

---

[1] Tefillin are a set of two small black leather boxes containing scrolls of parchment inscribed with verses from the Torah, attached to leather straps, traditionally worn by adult Jewish men during weekday morning prayers.

1

exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability . . . .").  To overcome that general prohibition, the government must make two showings: first, that the burden on the prisoner's religious exercise furthers a compelling governmental interest, and second, that the burden constitutes the least restrictive means of furthering that compelling governmental interest. *Id.*; *see also Holt v. Hobbs*, 574 U.S. 352, 364 (2014).

For the first showing, the prison denied Watson access to tefillin due to prison safety and security concerns.  The prison recognized that tefillin could be used as a weapon or a tool for escape.  As a result, the prison determined that two guards would have to observe Watson for fifteen minutes while he prayed with tefillin in his cell, and that the guards would also have to transport the tefillin to and from storage outside Watson's cell.  Importantly, despite Watson's mental illness, checkered disciplinary record, and prior escape, the prison did not reject Watson's request based upon the safety or flight risk that he would pose with access to tefillin.  The prison determined that it could account for those risks by having two guards observe Watson while he prayed with tefillin and by having them transport and store the tefillin outside of Watson's cell.  But, according to the prison, staffing those guards in that way would pull them away from their normal duties, which would critically compromise prison safety and security by causing the remainder of the prison to be understaffed.  On that rationale – the marginal loss in prison safety and security caused by diverting two guards from their normal duties – the prison determined that Watson could never have tefillin in his cell.

2

To prevail at summary judgment, the prison must make the second showing – that furthering those marginal safety and security interests by denying Watson tefillin satisfies the "exceptionally demanding" least-restrictive-means test. *Holt*, 574 U.S. at 364 (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 728 (2014)). By its text, RLUIPA acknowledges that compliance with its mandate "may require a government to incur expenses in its own operations to avoid imposing a substantial burden on religious exercise." 42 U.S.C. § 2000cc-3(c). Thus, crediting the prison's assessment that the diversion of two guards would critically compromise the safety and security of the prison, *see Cutter v. Wilkinson*, 544 U.S. 709, 722–23 (2005), the prison must still establish that it cannot otherwise provide the staffing needed for Watson's request. *See, e.g.*, *Yellowbear v. Lampert*, 741 F.3d 48, 59 (10th Cir. 2014) (Gorsuch, J.) (vacating summary judgment when a prison demonstrated only that its denial of a religious accommodation was due to "some marginal cost it consider[ed] too high" and not to an "inability to provide adequate security at any price").

On this record, the prison does not make that showing. The prison argues that it cannot accommodate Watson's request within its current operational model. But that misapprehends RLUIPA, which protects more than merely the exercise of religious liberty that comports with a prison's current budget or staffing model. Rather, RLUIPA – like any number of federal statutes – comes with compliance costs.[2] And unless those

---

[2] Examples include the Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 745, *see* Robert P. Bartlett III, *Going Private But Staying Public: Reexamining the Effect of Sarbanes-Oxley on Firms' Going-Private Decisions*, 76 U. Chi. L. Rev. 7, 8 (2009) (observing that "the Sarbanes-Oxley Act of 2002 (SOX) has engendered a vigorous

costs unavoidably compromise compelling prison interests, they cannot justify burdens

on religious exercise. *See* 42 U.S.C. § 2000cc-3(c). But here, the prison does not explain

why it cannot accommodate Watson's request through some other staffing model or

budgetary approach. *See Washington v. Klem*, 497 F.3d 272, 284 (3d Cir. 2007) ("[T]he

Government must consider and reject other means before it can conclude that the policy

chosen is the least restrictive means."). The prison does not provide the details of its

staffing model, much less a non-conclusory explanation of its inability under that model

to adjust staffing to accommodate Watson's request. The prison likewise does not show

that authorizing overtime hours to accommodate Watson's request would undermine

prison safety and security. Without any such evidence, the prison has not met its

burden.[3]

---

debate concerning whether the post-SOX increase in the cost of being a public company has harmed the competitiveness of US capital markets" (footnote omitted)), and the Occupational Safety and Health Act of 1970, Pub. L. No. 91-596, 84 Stat. 1590, *see* Gregory C. Keating, *Is Cost-Benefit the Only Game in Town?*, 91 S. Cal. L. Rev. 195, 239 (2018) (observing that "[the Occupational Safety and Health Administration] generally considers a standard economically feasible when the costs of compliance are less than one percent of revenues" (quotation omitted)).

[3] *See Hobby Lobby*, 573 U.S. at 728–29 (finding that under RLUIPA's sister statute, the Religious Freedom Restoration Act of 1993 (RFRA), the U.S. Department of Health & Human Services could not prove least restrictive means without providing estimates or statistics); *Williams v. Annucci*, 895 F.3d 180, 193–94 (2d Cir. 2018) (vacating summary judgment when a correctional department denied a prisoner dairy-free, egg-free, grape-free, kosher, vegetarian meals because such denial was not the least restrictive means of running a cost-efficient prison food-service program); *Yellowbear*, 741 F.3d at 59 (finding that a prison could not prove least restrictive means without at least trying to quantify the costs of accommodation and explain how those costs implicate prison budget or administration).

4

If anything, the prison's evidence undermines its own position. The prison notes that it already authorizes around 3,000 eight-hour overtime shifts per month. But to justify denying Watson's request, each of those cumulative 24,000 monthly overtime hours must be essential to furthering the prison's compelling interests. And even if so, the prison would also have to demonstrate that it could not authorize additional overtime to accommodate Watson's request. For reference, suppose that Watson's request would require one hour of overtime per weekday (thirty minutes each for two guards), that would total between twenty and twenty-five hours of overtime a month, which is less than one-tenth of one-percent of the current authorized *overtime* – to say nothing of the prison's overall staffing budget, let alone its total budget. *See Hobby Lobby*, 573 U.S. at 730 ("We do not doubt that cost may be an important factor in the least-restrictive-means analysis, but both RFRA and its sister statute, RLUIPA, may in some circumstances require the Government to expend additional funds to accommodate citizens' religious beliefs."); *Moussazadeh v. Tex. Dep't of Crim. Just.*, 703 F.3d 781, 797 (5th Cir. 2012) ("Although cost reduction, as a general matter, is unquestionably a compelling interest of [the prison system], we are skeptical that saving less than .05% of the food budget constitutes a compelling interest."). Rather than proving that Watson's request is unworkable, the prison's evidence suggests a malleable budget and a flexible staffing model that can adapt to other demands *but not to Watson's request to pray with tefillin*.

Perhaps as a practical matter the prison can do nothing more operationally and budgetarily to accommodate Watson's request while also fulfilling its compelling interests in prison safety and security. That may well be the case – especially since

5

Watson poses a safety and flight risk and because he requests access to a religious object that could be weaponized or used to facilitate escape – but the prison has not made that showing at summary judgment. *See Greene v. Solano Cnty. Jail*, 513 F.3d 982, 989–90 (9th Cir. 2008) ("[I]n light of RLUIPA, no longer can prison officials justify restrictions on religious exercise by simply citing to the need to maintain order and security in a prison."); *Murphy v. Mo. Dep't of Corr.*, 372 F.3d 979, 988 (8th Cir. 2004) ("Nevertheless, [a prison] must do more than merely assert a security concern."). For that reason, I respectfully dissent from Majority Opinion's affirmance of summary judgment for the prison on the RLUIPA claim.

II.     WATSON'S FREE EXERCISE CLAIM ALSO SURVIVES SUMMARY JUDGMENT.

I also respectfully dissent from the Majority Opinion's affirmance of summary judgment to the prison on Watson's free exercise claim. The District Court granted summary judgment based entirely on its analysis of Watson's RLUIPA claim, reasoning that because the denial of tefillin satisfied the more demanding RLUIPA standard, it necessarily complied with the less stringent standard for a free exercise claim. *See Watson v. Christo*, 2019 WL 1324941, at *6–*7 (D. Del. Mar. 25, 2019). But because I believe that the prison fails to defeat Watson's RLUIPA claim on this record, Watson's free exercise claim should be assessed independently under the factors announced in *Turner v Safley*, 482 U.S. 78 (1987). *See, e.g.*, *Fontroy v. Beard*, 559 F.3d 173, 177–78 (3d Cir. 2009) (applying the *Turner* factors to determine whether a correctional department policy violated prisoners' First Amendment rights). Because the prison

advances no arguments in that respect, the judgment denying Watson's free exercise claim should be vacated and remanded as well.