203 P.3d 712

Steven Lee HYDE, Petitioner–Appellant,

v.

Greg FISHER, Warden,
IMSI, Respondent.

No. 30648.

Court of Appeals of Idaho.

Jan. 28, 2009.

Steven L. Hyde, Boise, pro se appellant.

Hon. Lawrence G. Wasden, Attorney General; Mark W. Olson, Deputy Attorney General, Boise, for respondent.

GUTIERREZ, Judge.

Steven Lee Hyde appeals from the district court's denial of his petition for a writ of *habeas corpus*. We affirm in part and reverse in part.

## I.

### FACTS AND PROCEDURE

In *Hyde v. Fisher*, 143 Idaho 782, 783–84, 152 P.3d 653, 654–55 (Ct.App.2007), we summarized the facts and initial procedure of this case:

> Hyde is an inmate committed to the custody of the Idaho Department of Correction (IDOC [or the Department]) under the laws of the state of Idaho. Since 1993, Hyde has been housed at the Idaho Maximum Security Institution (IMSI), under the supervision of respondent, Warden Greg Fisher.... Hyde's religious practices include Odinism and Native American religion. Traditional Native American religious practices were formerly allowed at IMSI. The sweat lodge ceremony was allowed at IMSI from 1992 until 1998, when the sweat lodge was dismantled after former Warden Paskett concluded that the sweat lodge grounds had been desecrated by a group of Native American practitioners who were found roasting wieners over the sweat lodge fire. Smudging ceremonies were permitted from the opening of IMSI in 1989 until 2002 when the IDOC interpreted its "No–Tobacco" policy as prohibiting burning of any kind. IMSI prison officials also prohibit Hyde from using a ceremonial pipe to smoke a tobacco-free form of kinnikinnik, from wearing a choker, from possessing a feather and certain herbs and grasses having spiritual significance to him, and from operating a club designed to facilitate the practice of the Native American religion at IMSI.

On October 30, 2001, Hyde filed a petition for writ of *habeas corpus* in which he

avers that the [IDOC] has violated his rights to practice his religion under the First and Fourteenth amendments to the United States Constitution; Article 1, §§ 3 and 4 and Article 4, § 2 of the Idaho State Constitution; the Religious Exercises in Land Use and by Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc, *et seq.*; and the Free Exercise of Religion Protected Act (FERPA), Idaho Code § 73–401, *et. seq.* Specifically, Hyde alleges constitutional and statutory violations of his right to exercise the Native American religion by way of the sweat lodge, ceremonial pipe, smudging, and possession of kinnikinnik, sage, feathers, a choker, and a bandana, among others. Hyde proposed numerous methods of accommodating his religious rights.

The [Department] moved the district court to dismiss Hyde's petition for writ of *habeas corpus.* [It] argued that Hyde had not stated a claim upon which relief could be granted, that he had not satisfied the security bond requirement of I.C. § 6–610, that *habeas corpus* is not a vehicle for enforcement of the FERPA and the RLUIPA, and that the Establishment clauses of the United States and Idaho constitutions prohibit the [IDOC] from providing the requested relief. The district court granted in part the [IDOC's] motion to dismiss on the basis that Hyde had failed to post a security bond when filing his claims for relief under the RLUIPA and the FERPA.

As to Hyde's constitutional claims, the court held a bench trial on the merits. At the close of Hyde's case-in-chief, the [Department] moved for dismissal. The district court noted that it had heard sufficient evidence regarding the government's compelling security interest and determined the [IDOC] established without question that security and safety at IMSI represented a compelling interest. The court denied the [Department's] motion to dismiss, however, and allowed additional testimony to determine whether [it] had considered less restrictive alternatives than a complete ban on Hyde's religious practices.

After hearing all the evidence, the district court issued written findings of fact and conclusions of law. The district court denied Hyde's constitutional free exercise claim, ruling that the IMSI regulations prohibiting the items necessary for Hyde to exercise his Native American religion have a valid, rational connection to a legitimate penological security interest. The district court denied Hyde's petition as to his equal protection claim on the basis that, given the valid penological interest in security and the good order of the prison population, it would constitute an unreasonable and burdensome cost for the [Department] to fully accommodate Hyde's religious practices. The court also held that lack of parity in resources allocated among religions, alone, is not grounds for an equal protection claim....

Subsequently, this Court addressed Hyde's appeal, holding that the district court erred in granting the IDOC's motion to dismiss Hyde's RLUIPA and FERPA claims. *Id.* at 784, 152 P.3d at 655. Specifically, we held that the security bond requirement of I.C. § 6–610 does not apply to indigent prisoners and that Hyde's statutory claims may be addressed in this *habeas corpus* action. *Id.* at 787–88, 152 P.3d at 658–59. Not reaching Hyde's constitutional claims, we temporarily remanded the case back to the district court for issuance of findings and conclusions regarding the RLUIPA and FERPA claims.

On remand, the district court addressed the merits of Hyde's statutory claims and again denied them, concluding that:

The Respondent, Greg Fisher, Warden, IMSI, has met the two-pronged test of both the Federal and State statutes under the facts of this case. The imposition of the burden on Hyde to practice his Native American Religion by the closing of the sweat lodge in the prison and the impact of regulating inmate's possession of personal property were done in furtherance of the compelling governmental interest of insuring safety and security in Idaho's maximum security prison. These actions by prison officials, in conjunction with the provision of places for religious worship, the acquisition and possession of religious ma-

terials under the guidance of an independent, outside Native American religious advisor, represent the least restrictive means of furthering the compelling governmental interest in providing safety and security in Idaho's maximum security prison.

Hyde appeals the district court's denial of his constitutional and statutory claims of relief and also raises several issues arising after our remand to the lower court. We begin by addressing the issues arising after remand.

## II.

## ANALYSIS

### A. Issues Arising After Remand

#### 1. Motion to disqualify and motion to stay proceedings

■ Hyde argues the district court erred by failing to rule on his motion to disqualify the judge for cause as well as his motion to stay the proceedings prior to denying his claims on remand. It is the responsibility of the appellant to provide a sufficient record to substantiate his or her claims on appeal. *State v. Murinko*, 108 Idaho 872, 873, 702 P.2d 910, 911 (Ct.App.1985). In the absence of an adequate record on appeal to support the appellant's claims, we will not presume error. *State v. Beason*, 119 Idaho 103, 105, 803 P.2d 1009, 1011 (Ct.App.1991).

■ Here, while Hyde attached to his brief copies of both motions and the Department's objection to his motion to disqualify, these documents were not made part of the clerk's record on appeal. Simply attaching documents to one's brief does not include them in the record. *See Ohman v. Talbot Family Trust*, 120 Idaho 825, 820 P.2d 695 (1991) (holding that jury instructions attached to an appeal brief were not part of the record). We will not presume error where we have no record to assess the merits of the motions, nor the court's treatment of them.

#### 2. Allegation of judicial bias

Hyde also argues that the district court abused its discretion by failing to "disclose its religious affinity with the defendant." Specifically, he references letters showing that Warden Fisher and the trial court judge in this case attend the same church. Again, the letters to which Hyde refers were not made a part of the clerk's record on appeal— Hyde merely provided them to this Court attached to a document entitled "Memorandum/Complaint Request for Investigation." As we indicated above, such a procedure is not sufficient to place the letters properly before this Court and thus, we do not address the merits of Hyde's argument.

#### 3. Due process

■ Finally, Hyde contends the district court, on remand, abused its discretion by "improperly assessing the evidence presented at trial." His argument appears to be that the lower court's failure to allow the parties to submit additional briefing on remand violated his right to due process. In support of this contention, Hyde asserts that when remanding the case, this Court ordered the district court "to let the parties brief their arguments" prior to issuing its decision on remand. This, however, is incorrect. We simply ordered the court to made findings and conclusions on Hyde's statutory claims and stated that "[a]dditional taking of evidence is not required in this instance based on the extensive evidentiary record already developed before the district court." *Hyde v. Fisher*, 143 Idaho 782, 788, 152 P.3d 653, 659 (2007). Nowhere in these directions did we address the issue of supplemental briefing.

Hyde also cites no authority for his contention that he was entitled to file a brief on remand such that his due process rights would be implicated by disallowance of such an opportunity. Most importantly, Hyde has not shown that the opportunity he had to submit briefs to the district court prior to the original appeal was insufficient to afford him due process. *See Dallas v. Arave*, 129 Idaho 819, 825, 933 P.2d 108, 114 (Ct.App.1997) ("Although the nature and scope of the due process rights afforded to inmates is necessarily limited, procedural due process is met when the inmate is provided with notice and an opportunity to be heard, to ensure that

the individual is not arbitrarily deprived of his rights.") Thus, we find no merit in Hyde's due process argument.

## B. Statutory Claims

On remand, the district court denied Hyde's statutory claims under both RLUIPA and FERPA. Noting that the standards in the federal and state statutes are essentially the same, the district court concluded that the Department had established that it had a compelling governmental interest in denying Hyde's requests as well as that IMSI had imposed the least restrictive means of furthering its compelling interest in providing safety and security at the maximum security facility.

### 1. RLUIPA

RLUIPA was adopted by Congress in response to the United States Supreme Court's decisions in *Employment Division, Department of Human Resources v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), and *City of Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). Prior to *Smith,* the Supreme Court had employed a "compelling state interest" standard for testing the constitutional validity of laws of general applicability that affect religious practices. Government actions that substantially burdened a religious practice had to be justified by a compelling governmental interest. In *Smith,* 494 U.S. at 878–882, 110 S.Ct. at 1599–1602, 108 L.Ed.2d at 885–887 the Court changed course when it ruled that laws of general applicability that only incidentally burden religious conduct do not offend the First Amendment. Congress sought to reinstate the pre-*Smith* standard by enacting the Religious Freedom Restoration Act ("RFRA") which prohibited both state and federal governments from substantially burdening a person's exercise of religion even if the burden results from a rule of general applicability unless the government can demonstrate the burden is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that compelling governmental interest. 42 U.S.C. 2000bb *et seq.* In *City of Boerne,* 521 U.S. at 529–36, 117 S.Ct. at 2168–72, 138 L.Ed.2d at

644–49 however, the Supreme Court invalidated the RFRA as it applied to states and localities, holding that the statute exceeded Congress's remedial powers under Section 5 of the Fourteenth Amendment. Congress responded to *City of Boerne* by enacting the RLUIPA in September 2000. RLUIPA is largely a reprisal of the provisions of the RFRA, but its scope is limited to laws and regulations that govern land use and institutions such as prisons that receive federal funds. In relevant part, it provides:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—
>
> > (1) is in furtherance of a compelling governmental interest; and
> >
> > (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. §§ 2000cc–1. Thus, a claim under RLUIPA includes four elements. On the first two elements, that an institutionalized person's religious exercise has been burdened and that the burden is substantial, the petitioner bears the burden of proof. *Id.* at § 2000cc–2(b). Once a petitioner has established that his religious exercise has been substantially burdened, the onus shifts to the government to show that the burden furthers a compelling governmental interest and, fourth, that the burden is the least restrictive means of achieving that compelling interest. *Id.* Regarding IMSI's policies on the sweat lodge, the personal property policy, and the disallowance of smudging ceremonies, the first two elements are not in dispute. Thus, we only consider whether IMSI's polices further a compelling governmental interest and, if so, whether they are the least restrictive means of furthering such an interest.

■ By contrast, a prison regulation challenged on First Amendment grounds will be upheld if it is reasonably related to a legitimate penological interest. *Lindell v. Frank,* 377 F.3d 655, 657 (7th Cir.2004). Because the IDOC bears a heavier burden under RLUIPA, we will first consider Hyde's statu-

tory claims. If the Department meets its burden under RLUIPA and FERPA, it will have necessarily met the less stringent burden of showing that the challenged conduct was reasonably related to a legitimate penological interest under the First Amendment.

### a. Compelling governmental interest

In *Cutter v. Wilkinson,* 544 U.S. 709, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005), the United States Supreme Court explored the "compelling governmental interest" prong of RLUIPA, first noting the context in which RLUIPA was passed. The Court recognized that "[t]o secure redress for inmates who encountered undue barriers to their religious observations, Congress [in RLUIPA] carried over from RFRA the 'compelling governmental interest'/'least restrictive means' standard." *Id.* at 717, 125 S.Ct. at 2119, 161 L.Ed.2d at 1031. The Court repeatedly pointed out, however, that in applying that standard, the lower courts must remain mindful of the context: "Lawmakers anticipated ... that courts entertaining complaints under 42 U.S.C. § 2000cc § 3 would accord 'due deference to the experience and expertise of prison and jail administrators.'" *Id.* The Court noted that:

We do not read RLUIPA to elevate accommodation of religious observances over an institution's need to maintain order and safety. Our decisions indicate that an accommodation must be measured so that it does not override other significant interests. In *Estate of Thornton v. Caldor, Inc.*, the Court struck down a Connecticut law that "arm[ed] Sabbath observers with an absolute and unqualified right not to work on whatever day they designate[d] as their Sabbath." 472 U.S. 703, 709, 105 S.Ct. 2914, 2917, 86 L.Ed.2d 557, 562 (1985). We held the law invalid under the Establishment Clause because it "unyielding[ly] weigh[ted]" the interests of Sabbatarians "over all other interests." *Id.* at 710, 105 S.Ct. at 2918, 86 L.Ed.2d at 563.

The Court further noted:

We have no cause to believe that RLUIPA would not be applied in an appropriate-

ly balanced way, with particular sensitivity to security concerns. While the Act adopts a "compelling governmental interest" standard ... "[c]ontext matters" in the application of that standard. *See Grutter v. Bollinger,* 539 U.S. 306, 327, 123 S.Ct. 2325, 2338, 156 L.Ed.2d 304, 331 (2003). Lawmakers supporting RLUIPA were mindful of the urgency of discipline, order, safety, and security in penal institutions. *See e.g.,* 139 Cong. Rec. 26190 (1993) (remarks of Sen. Hatch). They anticipated that courts would apply the Act's standard with "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." Joint Statement 16699 (quoting S.Rep. No. 103–111, at 10(193), U.S.Code Cong. & Admin. News 1993, pp. 1892, 1899, 1900). [Joint Statement of Sen. Hatch and Sen. Kennedy on RLUIPA appearing at 146 Cong. Rec. 16698, 16699 (2000) ].

*Id.* at 722–23, 125 S.Ct. at 2122–23, 161 L.Ed.2d at 1034–35. Additionally, the Court noted: "Should inmate requests for religious accommodations become excessive, impose unjustified burdens on other institutionalized persons, or jeopardize the effective functioning of an institution, the facility would be free to resist the imposition." *Id.* at 726, 125 S.Ct. at 2113, 161 L.Ed.2d at 1037. Lest any doubt remain, the Court then repeated its message a final time: "It bears repetition ... that prison security is a compelling state interest, and that deference is due to institutional officials' expertise in this area." *Id.* at 725 n. 13, 125 S.Ct. at 2124, n. 13, 161 L.Ed.2d at 1036, n. 13.

We also note that in the only Idaho state case to address the "compelling governmental interest" standard in the context of religious exercise of incarcerated persons, this Court held that the Idaho State Board of Correction's (Board) policy disallowing the use of any tobacco products was in furtherance of a compelling governmental interest.[1]

---

1. *Roles* was addressed in the context of FERPA. However, as we discuss below, there is no dis-

tinction between FERPA's compelling govern-

*Rules v. Townsend*, 138 Idaho 412, 414, 64 P.3d 338, 340 (Ct.App.2003). There, the inmate was a practitioner of a Native American religion and insisted that tobacco was an "absolute tenant" of his religious belief and practice. On this basis, he argued that the Board's absolute ban on the use of tobacco products violated his right to exercise his religion under FERPA. We concluded that the Board demonstrated beyond any genuine dispute that it had a compelling interest in eliminating tobacco in prisons. *Id.* at 413, 64 P.3d at 339. Specifically, we noted that the Board has compelling interests in prohibiting tobacco to promote public health, providing an environment free from second-hand smoke, reducing litigation related to second-hand smoke, protecting buildings against property damage, and curtailing rising medical costs. *Id.*

### 1. Sweat lodge ceremonies[2]

In his initial petition, Hyde requested that Native American religion practitioners be allowed to attend a "sweat ceremony" at least one time per week as well as a "pipe ceremony" on the "sweat grounds" at least one evening per week. He requested that IMSI be responsible for providing the place and materials[3] necessary to build a sweat lodge to conduct ceremonies inside and that the area be fenced to keep "Non–Natives" out.

More specifically, he sought that the sweat lodge area be considered by the staff to be "sacred ground" and not entered by staff unless a Native American Indian League (NAIL)[4] member is present. He requested that practitioners be allowed to "maintain elements of a religious nature out at the sweat lodge," and that to facilitate a sweat ceremony, a member of NAIL be allowed to start a fire two hours before such a ceremony is to take place. He proposed that IMSI be allowed the postponement of a sweat ceremony for "real" security reasons, but that inmates would then be allowed to complete the ceremony "that very same day or the next day as security allows."

In addressing whether the Department demonstrated a compelling governmental interest in restricting use of the sweat lodge and enforcing the personal property policy, the district court provided the following background of the institution in which Hyde is being held:

> Idaho Maximum Security Institution (IMSI) is the maximum security penal facility in the State of Idaho. It is reserved for the most dangerous offenders based on the nature of the offense committed, past criminal history, danger posed to the community and risk of escape among other factors. The current facility was con-

mental interest standard and that embodied in RLUIPA.

**2.** Some states along with the Federal Bureau of Prisons allow sweat lodges and other Native American religious practices at maximum security prisons. *See Pounders v. Kempker*, 79 Fed. Appx. 941, 943 n. 2 (8th Cir.2003) (noting that Missouri eventually built a sweat lodge at its maximum security Potosi Correctional Center); *Allen v. Toombs*, 827 F.2d 563 (9th Cir.1987) (recognizing that general population inmates at Oregon maximum security prison were allowed to participate in weekly sweat lodge ceremonies); *Morrison v. Cook*, 1999 WL 717218, *4 (D.Or. 1999) (noting that Oregon maximum security prison allows volunteer-led weekly sweat lodge ceremonies held twice on Saturdays, bi-weekly smudging ceremonies, annual Sundance Sweats for four days, annual Spiritual run between July 7 and 10, the annual Yard Pow–Wow, Charter Nights twice a year, Lakota Youth Panel nights, and smudging on occasions of personal grief); *Crocker v. Durkin*, 159 F.Supp.2d. 1258, 1264 (D.Kan.2001) (noting that a sweat lodge was

available at a high security federal penitentiary). *See also* Nevada Department of Corrections, *Administrative Regulation Manual*, Native American Religious Activities, AR 809 (August 30, 2005), available at *http://www.doc.nv.gov/ar/htm/AR809. htm* (last visited January 9, 2009).

**3.** This included fire wood, an ax and chainsaw if the wood is not pre-cut, blankets or fresh sage to cover the sweat lodge floor, a water supply, loose fitting shorts, lava rocks, five gallon buckets, a spirit pole and a "dipper." Hyde also requested that inmates be allowed to receive from outside sources a medicine pipe and bag of leather or fur, a large traditional-size drum, drumsticks, a small drum, and three ceremonial flutes which they would be allowed to keep in a locked locker on sweat lodge grounds.

**4.** In his petition, Hyde characterized the "Native American Indian League" as an inmate-organized group of Native American religion practitioners, which he requests be recognized as a "religious organization" and that it be allowed to self-govern.

structed to house three hundred thirty (330) inmates, single celled. Conditions at the time of the hearing find five hundred seventy (570) double-celled inmates in the same facility supervised by the same sized staff. Prison riots, assault and batteries on staff and inmates, increased gang activity and drug use have led to the adoption of clearly defined regulations governing inmate property.

The court then separately addressed the religious practices that Hyde claimed were being curtailed by the new policy, describing first the nature of the sweat lodge ceremonies, the history of their practice at IMSI, and the security hazards posed by them:

Hyde ... has resided in IMSI since 1993. From 1993 until 1998 Hyde was allowed to practice his Native American religion. [Native American] [r]eligious ceremonies are held in a sweat lodge, which is constructed of long wooden poles. The enclosure is windowless, disallowing scrutiny of activities within. Sweat lodge ceremonies were conducted in a traditional manner with an open fire used to heat ceremonial rocks which, when heated, were doused with water creating steam. Axes and firewood were provided to the inmates. Ceremonies were conducted by the inmates in the absence of approved religious advisors or volunteers from outside the penitentiary. No one, including guards, was permitted to attend who was not a [Native American religion] worshipper.

Ceremonies were discontinued in the sweat lodge by order of [the former Warden] for several reasons. First, it was discovered that the privilege of conducting the ceremony was violated when Native American practitioners were found roasting wieners over the sweat lodge fire. Secondly, it was found that given prison overcrowding, the influx of gang activity and increase of riots and disturbances at IMSI, the sweat lodge ceremonies had to be discontinued for reasons of prison security.

Several aspects of the sweat lodge ceremony were found to create high security risks. The totally enclosed sweat lodge disallowed observation by prison guards or any attendance or supervision by prison religious advisors. An outside Native American practitioner advising the Warden [sic] was skeptical of the seriousness of the ceremonies being held at the sweat lodge. Prison officials felt their efforts to combat gang activities at IMSI were compromised by these secretive sweat lodge ceremonies. The sweat lodge also provided prisoners the opportunity to make weapons, a further danger to security.

The wooden poles used to construct the sweat lodge were stored in the prison yard where they served as potential weapons and were long enough to have been used to vault some prison enclosures, increasing the risk of escape.

Firewood was also stored in the prison yard where it could be taken to be used as a weapon or ignited, posing security risks.

The rocks, axes and combustibles used in sweat lodge ceremonies were also deemed security risks by the prison authorities. The free use of these potential and dangerous weapons in sweat lodge ceremonies of questionable seriousness became a significant concern.

Cooking wieners; [sic] and the concerns of the prison's outside Native American religious advisor, caused the Warden [sic] to find that the abuse of the sweat lodge and ceremonies held there, presented security risks requiring its discontinuance. Guards also discovered that contraband material, which would be made into weapons, had been hidden in the sweat lodge, furthering their security concerns. Following dismantling of the sweat lodge, it was determined that marijuana had been smoked during ceremonies in violation of prison regulations.

... The specialized nature and exclusivity of the sweat lodge ceremonies created tension and resentment with other inmates at IMSI. This resentment made it more difficult to deal with prison gangs and maintain safety and security.

With these facts in mind, the district court concluded that while the prohibition of sweat lodge ceremonies did impose a burden on Hyde's practice of his Native American religion, IMSI had demonstrated a compelling

governmental interest "in providing for the safety and security of prison inmates, prison guards and staff, as well as the public." The court further concluded that dismantling of the sweat lodge was "directly related to prison security which requires strict inmate supervision, prevention of the manufacture or use of weapons, the reduction of the risk of escape, and the possession or use of controlled substances."

Recently, in *Fowler v. Crawford,* 534 F.3d 931 (8th Cir.2008), the Eighth Circuit Court of Appeals held that a prison's prohibition on the use of a sweat lodge was in furtherance of a compelling governmental interest. The facts in that case are remarkably similar to those we address here. Fowler, of Cherokee descent, was an inmate at a maximum security prison, Jefferson City Correctional Center (JCCC), operated by the Missouri Department of Corrections. Unsatisfied with prison regulations which allowed him and other inmates practicing the Native American religion to meet twice weekly in the prison chapel, Fowler demanded access to a sweat lodge a minimum of seventeen times a year, which he insisted was essential to practicing his faith.[5] Prison officials refused, and faced with Fowler's RLUIPA suit, cited security concerns—specifically, the fact that incidents of violence have occurred at JCCC "during call-out times for religious services," that groups such as the Native American group who do not have regular volunteers to oversee their ceremonies pose a particular security risk because their meeting times may be used for inappropriate purposes—including sexual impropriety and drug use—that "there's no way to know what goes on in there," that the sweat lodge is an enclosed area screened from view of those outside the lodge in which offenders are tending a fire, handling firewood and large hot rocks, creating hot steam, and using tools, that extending unique privileges such as the sweat lodge to one group of inmates to the exclusion of others creates a risk of resentment among the inmate population leading to the potential for unrest and disturbance, the fact that the objects used during a sweat lodge ceremony—namely rocks, willow poles, shovels, deer antlers, and split wood, can be used as weapons, and that the sweat lodge would "consume considerable institutional financial and personnel resources" at the expense of monitoring the balance of the inmate population.

In deciding whether the foregoing concerns established a compelling governmental interest, the *Fowler* court examined both *Cutter's* edict that "due deference" be accorded the experience and expertise of prison officials and an earlier Eighth Circuit case, *Hamilton v. Schriro,* 74 F.3d 1545 (8th Cir. 1996), holding that RFRA[6] did not mandate inmate access to a sweat lodge. There, the Eighth Circuit had reversed the district court, noting that:

> [T]he lower court got off on the wrong foot ... by not giving appropriate deference to the decisions of prison administrators and appropriate recognition to the peculiar and restrictive circumstances of penal confinement.... [J]udgments regarding prison security are "peculiarly within the province and professional expertise of corrections officials, and, in absence of *substantial* evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters."

*Id.* at 1553.

The Fowler Court continued its analysis, noting that "a prison's interest in order and security is always compelling." *Id.* at 534 F.3d at 939 (citing *Cutter,* 544 U.S. at 725 n. 13, 125 S.Ct. 2113). The court further explained that to ensure that prison policies are in furtherance of that compelling interest, officials' security concerns must be

---

5. The Eighth Circuit engaged in detailed description of what a sweat lodge and its corresponding ceremony entails, and we note no significant difference between the structure and ceremony the court described in *Fowler* and the structure and ceremony at issue in this case. *See Fowler,* 534 F.3d at 934.

6. The court reasoned that its decision under RFRA was relevant to its determination under RLUIPA because the Cutter Court had indicated that in the prison context, the RLUIPA standard was identical to the RFRA standard. *Fowler,* 534 F.3d at 937.

grounded on more than mere speculation, exaggerated fears, or post-hoc rationalizations ... [b]ut no reasonable jurist, affording due deference to prison officials, can dispute that serious safety and security concerns arise when inmates at a maximum security prison are provided ready access to (1) burning embers and hot coals, (2) blunt instruments such as split wood and large scalding rocks, (3) sharper objects such as shovels and deer antlers, and (4) an enclosed area inaccessible to outside view.

Also recognizing the drain on prison security's manpower, the Court concluded that the record demonstrated JCCC officials' "legitimate" fears surrounding the operation of a sweat lodge and that prohibiting such an operation is in furtherance of a compelling governmental interest. *Id.*

■ In this case, IMSI officials expressed many of the same security concerns arising from operation of a sweat lodge as those advanced by JCCC officials in *Fowler*. IMSI's warden explicitly indicated his security concerns in providing access to a sweat lodge, including inmates being unsupervised in an enclosed area out of the view of any prison staff, the fact that Hyde wanted the area to be fenced off and not accessible to prison staff without being accompanied by a NAIL member, the possibility that materials used to construct the sweat lodge could be used to "break a window, vault a fence, kill someone, [or] start a fire," the risk that the structure could be used to conceal contraband, as well as the risk of unrest within the inmate population due to the "special" treatment that would be afforded Native American religion practitioners. He also expressed security concerns over the fact that inmates would be handling firewood, large rocks, fire, steam, and tools—all of which were potential weapons. The warden also pointed out that operation and oversight of a sweat lodge and the accompanying ceremonies which Hyde demanded access to once a week (and which required an inmate starting the fire two hours before the ceremony) would divert limited prison resources away from the general inmate population to the detriment of the institution. The warden illustrated his point that security concerns at IMSI were real—

alluding to various assaults, near fatal injuries suffered by staff members, and the death of an inmate, all caused by violence perpetrated by inmates. He also discussed Exhibit A, a fifty-page "disruptive behavior report" covering January 2001 through late November 2002, which provides a brief documentation of each individual emergency (approximately forty per page) that took place during that time period and disrupted usual operations. He also showed the court and described various hand-made weapons that had been confiscated in the institution. He also asserted that the prison deals with a significant gang problem and provided examples of recent gang-related violence occurring at IMSI, as well as significant mental health problems among the inmate population. He also emphasized the fact that IMSI is a maximum security facility, holding many inmates who have been convicted of "very serious or heinous crimes" including crimes involving violence, the use of weapons, crimes against the person of another, and sex crimes and who have "demonstrated acting out aggressively against each other, against staff, threatening, intimidating, [and] coercing...." *See Harris v. Chapman*, 97 F.3d 499, 503–04 (11th Cir.1996) (finding state's "compelling interest in security and order within their prisons" especially applies "in 'close custody' facilities like MCI which contain extremely violent offenders").

A review of the record and foregoing authority convinces us that the district court properly found that the IDOC established that the prison's safety concerns in relation to disallowing operation of a sweat lodge at IMSI present a compelling governmental interest. At trial, the warden provided specific examples of security issues which had arisen in the institution and giving due deference to the warden's concerns, as well as applying common sense to the risks posed, we agree with the *Fowler* court that "no reasonable jurist ... can dispute that serious safety and security concerns arise when inmates at a maximum security prison are provided ready access to the material necessary for a sweat lodge ceremony." *Fowler*, 534 F.3d at 939. We also note that this Court readily affirmed in *Roles* that elimination of tobacco products,

even by those who smoked as part of religious observance, was supported by a compelling state interest. Here, the security risks are even more evident—and dangerous. Thus, we conclude that the Department has shown a compelling governmental interest in refusing its maximum security inmates at IMSI access to a Native American sweat lodge.

### 2. Smudging ceremony

■ In his *habeas corpus* petition, Hyde demanded that since "ritual purification is a mandate of the Native Religion," practitioners must be allowed to "smudge" at least once per morning in the recreation yard as an act of personal or group prayer.[7] He specifically requested that practitioners be allowed one hour each morning for smudging, but that IMSI may require the inmates to perform the ceremony in their cells.

Warden Fisher testified as to his security concerns regarding this practice, saying that it would drain limited staff resources to facilitate the practice and distract the staff from the performance of their other duties. He also stated that he objected to allowing inmates to smoke at IMSI given that the facility was a tobacco and smoke-free institution and the concern that other inmates would object to the presence of smoke. He also expressed his concern with inmates having control of fire and the implements to make fire to create the smoke necessary to conduct a smudging ceremony.

The district court did not address the viability of IMSI's restriction of smudging ceremonies as a separate issue, instead noting within its discussion of the personal property policy that the items that Hyde requested and was denied were primarily used for smudging ceremonies in the sweat lodge. Thus, by upholding both the sweat lodge and personal property restrictions, the court impliedly upheld the ban on smudging.

As discussed above, the risk of fires, either accidental or intentional, and the safety and health concerns for inmates and staff are the primary purposes for controlling smoking and ignition devices at IMSI. A serious fire could certainly result in death or injury to staff and inmates and moreover, the evacuation of cells would require staff to release the inmates and search each cell to ensure that all have safely evacuated, a monumental task. Additionally, the smoke and odors produced during smudging can cause or aggravate allergies, respiratory problems, and irritation to the eyes and is especially intrusive given the inmates' close living quarters, overcrowded conditions, and frequency of double-celled inmates. Given these circumstances, we conclude that smudging ceremonies are a threat to prison security and safety and given our previous recognition, this implication of security and safety is a compelling state interest served by the smudging ban.

### 3. Possession of religious objects

■ Hyde also challenges IMSI's policy regarding inmates' possession of personal property as imposing on his religious practice in violation of RLUIPA. The general policy allows for up to ten books (including religious) and one religious medallion per inmate in addition to "other religious items as authorized." On November 14, 2002, the IDOC operations administrator issued an addendum to the *general property policy* allowing for the possession of additional religious ceremonial items limited to:

1—Strand beads breakaway type only (rosary, dikhr, etc., no gemstones, plastic or wood only). Strand is to be breakaway material and no longer than 24" in length. **Ordered from approved sources only.**

1—Head cover to be black only, not to cover face and no more than shoulder length. **Ordered from approved sources only.**

1—Neck adornment not to exceed 1 1/2 inches high and 1 1/2 inches wide. The

---

7. "Smudging," as defined by Hyde, means "[t]o burn elements, first for purifying about the outer body, them [sic] inhaled to purify the insides, then prayers are spoken into the smoke as it rises, this carries the words up to the Creator, and keeps those words from being corrupted on the way." It is an act of purification and involves the burning of sage, cedar, or sweet grass and using a feather or fan to direct the smoke over the body. *Wilson v. Moore*, 270 F.Supp.2d 1328, 1350 (N.D.Fla.2003).

adornment with the chain may not exceed $35.00 in value. Maximum length is 36″ and is to be worn under clothing and not displayed. **Ordered from approved sources only.**

1—Pouch not to exceed 2″ × 3″ and unsealed at all times may be suspended by a leather or cloth 36″ breakaway drawstring strand from the neck or waist. Contents may consist of human hair, grains of sand, dried flowers, and up to 3 small stones no larger than 1″ in diameter. **Ordered from approved sources only.**

1—Set of 25 alphabet stones made of bone, plastic, and wood not to exceed 2″ × 2 1/2″. **Ordered from approved sources only.**

1—Set of Tarot cards (no larger than 4″ × 8″). **Ordered from approved sources only.**

1—Black headband not to exceed 2″ in width. **Ordered from IMSI laundry.**

In his petition, Hyde demanded that Native American religion practitioners be allowed to possess various objects not allowed under IMSI policy. He requested that IMSI supply each practitioner with a box at least twenty-four inches square "with a sliding fitted top, and a solid bottom, to keep the religious items used in the practioners [sic] personal ceremonies." He further requested that IMSI staff not be allowed to open these boxes unless the inmate-owner is present. He also requested recognition that Native American religion practitioners "need certain items for the practice of their religion" including, but not limited to, cedar, sage, sweetgrass, and kinnikinnik and that "because of the different tribes and cultural and historical differences between people, that some practioners [sic] may need different elements such as poll[e]n, lea[ves], roots, berries, and the like." For this reason, he insisted, practitioners "may make written request to the I.D.O.C.'s agent, to request approval of any such substance [and] approval shall be freely given, so long as the substance does not pose a 'real' threat to the safety or security of the institution." He requested that practitioners be allowed to possess in their personal box for use in religious ceremonies feathers, animal skulls and other animal parts, two colored bandanas, one "Native style" choker, two leather or cloth tobacco pouches not exceeding six inches square, and leather cloth sinew or thread to make their own medicine bags. He conceded that IMSI must be allowed to chemically test the herbs in an inmate's possession, and if they were found to be an unauthorized substance, that inmate's box would be "given to the (NAIL) Counsel for determination as to whether or not that person will continue practicing within the group." He also requested that inmates be allowed to possess the materials for "bead and leather hobby craft." Finally, in his *habeas corpus* petition, Hyde also requested that the inmates in the detention and administrative segregation areas of IMSI be allowed to keep in their cells and on their person at least one feather, medicine bag, and bandana.

The district court ruled that the institution had a compelling governmental interest in instituting the new personal property policy. The court noted that while Hyde and other Native American religion practitioners had been allowed to possess and use ceremonial pipes to smoke tobacco-free kinnikinnik, to wear chokers, and to possess quills and certain herbs and grasses of spiritual significance—objects which were primarily used for smudging ceremonies inside the sweat lodge—prison authorities determined that the safety and security of the institution required the new policy. The court agreed that some of the items Hyde wished to possess do represent safety and security threats including, "combustibles to light pipes; and the burning of any substances, herbs, grasses, and oils...." On this basis, the court concluded that the regulation of inmates' personal property in a maximum security facility for the purposes of safety and security is a compelling governmental interest.

At trial, Warden Fisher testified regarding his concerns over the property that Hyde requests that Native American religion practitioners be allowed to keep in their cells. In general, he stated that in the overall scheme of security at IMSI, control of inmate property is "paramount." He described how it is necessary, in a prison setting, to search and monitor inmate property on a regular basis

for a number of reasons, including to monitor for misuse of property such as making weapons, to prevent bartering, to prevent property from being utilized to signify gang affiliation or to hide contraband, and to prevent the unauthorized transfer of property which could be the result of strong-arming or other illicit activities. Specifically, he testified that in the context of a maximum security institution, which is generally populated by persons having a "criminal mindset," allowing the possession of more and varied items gives rise to the presence of contraband which can have "great value" to inmates in many respects—namely they may allow an inmate to have power over another inmate and create a subculture wherein the inmates use property as, among other things, a means of obtaining things and enforcing an agenda. He asserted that allowing the wrong property into the institution could contribute to inmate escape or mayhem. He also emphasized the importance of an explicit, uniform personal property policy, in that it creates clear, enforceable rules and efficient enforcement because staff members become familiar with allowable items and are not forced to determine the status of unfamiliar property—i.e., whether it is what the inmate says it is or what it appears to be or whether it is unauthorized contraband. He further discussed the significant amount of resources it would drain in order for staff members to have to identify and scrutinize a wide range of property and that given the large population at IMSI and the limited resources available, it would be "extremely difficult and distracting for the staff to keep up with the routine process that takes place in the institution" as well as have to deal with managing the additional property that Hyde demands that inmates be allowed to possess. In other words, in a prison setting where security demands that inmates and their cells be regularly searched, the more property inmates are allowed, the more problematic and time-consuming that those searches become—thus delaying other operations of the prison, including the accommodation of visitors and medical appointments for the inmates. He further alluded to the space problems that a 24–inch by 24–inch box would pose in an institution built for three hundred inmates that was now housing approximately 550. To emphasize the dangers faced in IMSI and the "resourcefulness" of inmates in utilizing both allowed and smuggled property, the warden showed the court numerous examples of weapons confiscated at IMSI that were formed from other objects. In sum, the warden opined that the policy limiting items allowed into the facility contributes significantly to the stability of the institution and the overall security of the staff, inmates, and general public.

In addition to his general concerns about the amount and type of property possessed by inmates, Warden Fisher also addressed his specific concerns regarding particular items of property that were seized from Hyde because they were not authorized by the new property policy. He said that inmates' possession of small bags of sweet grass, cedar, and sage poses security risks because staff would have a difficult time distinguishing—in a timely manner—those substances from illegal substances such as marijuana or determining whether allowed substances were mixed with disallowed ones. In this vein, Warden Fisher stated that the use of illegal drugs is a "major problem" at IMSI that poses significant safety risks to the staff and inmate population.

In regard to the possession of rabbit fur, Warden Fisher expressed concern that prison staff would not know where it came from and whether it was clean and sanitized. Concerning a choker necklace, the warden testified that he has concerns about the display of religious symbols which can lead to conflict among inmates. Additionally, he explained that Native American chokers were considered a protective device for the neck during combat and because of this, expressed his concern that it could promote mutual combat (which had just occurred that morning at IMSI) and/or be used as a weapon. Finally, in reference to the inmate possession of bird feathers, Warden Fisher testified that he was worried about contraband being hidden inside the quills and the fact that they were (or could be made) sharp, thus becoming weapons.

The record reflects that given the numerous religions and variations of religions

practiced at IMSI, there are potentially innumerable "religious" property items and a variation of currently approved religious property items. And as inmate populations rise, it is logical that the IDOC has begun to restrict the number of personal property items, to place limits on the total amount of inmate property allowed, to restrict property acquisition to sole or limited source(s) vendors, and to require property items to conform to uniform policies. We are convinced, as the IDOC argues, that such limitations enhance security, streamline management, and conserve the institution's limited resources.

It is also evident that in a prison setting, it is necessary to control, search, and monitor inmate property on a regular basis for a variety of reasons, including to control theft, monitor for misuse of property such as making weapons, prevent bartering, prevent property from being utilized to signify gang affiliation or to hide contraband, to prevent unauthorized transfer of property, which could be the result of strong-arming, gambling, or other debts, and to reduce the creation of jealousy and animosity among inmates which would create climate and control issues for staff that lead to inmates acting out against each other as well as staff. Given these real concerns, the security need to regularly search inmate cells is fundamental in a prison, and the greater the quantity and diversity of property that inmates are allowed, the more problematic and time-consuming these searches become. The need to control the amount of property is also related to health and safety concerns including the potential for fire hazards and cellmate relations given the significant amount of double-celling that is occurring due to prison overcrowding.

Warden Fisher testified that these concerns (preventing the misuse of property, ensuring security, and promoting safety) were all considered when the IDOC crafted its personal property policy. As we dis-

cussed above, prison security is a compelling interest, *Cutter*, 544 U.S. at 723, 125 S.Ct. 2113, and we give deference to prison officials' judgments as to the regulations necessary to promote safety and security in the institution where, as here, they specifically identify the dangers associated with the religious property items banned. Accordingly, we conclude that IDOC has a compelling interest in establishing restrictions on personal property, including that used for religious purposes.

### 4. Other requests

■ Finally, in his original *habeas corpus* petition, Hyde made several requests which do not fall into the categories above, including:[8]

5. Respondents shall recognize the Native American Indian League (NAIL) as a religious organization, allowing self governing as they had previously agreed to in the "Native American Indian Leauge [sic] Idaho Maximum Security Institution, Boise Idaho By–Laws"....

. . . . .

7. Respondents shall recognize that the (NAIL) will be allowed to exclude any member who by vote of the (NAIL) Counsel [is] deemed to be insincer [sic] in the practice of the Native American religion.

. . . .

23. The (NAIL) chairman or his appointee, will be allowed by the respondent to go to detention and administrative segregation one time per-week [sic], and hold a prayer/smudging ceremony with those inmates.... [T]hose inmates are subject by the (NAIL) Counsel for approval to keep [religious] items. This approval will be in writing signed by the chairperson of (NAIL) then signed by the Warden or his appointee.

24. Respondents will issue cards to each (NAIL) member, (membership according to By–Laws), those members already ap-

---

8. The evidence at trial showed that several of Hyde's requests—that Native American religious personnel have the same access to the inmates as other religious volunteers have, that Native American religion practitioners be allowed to wear their hair in "traditional" styles and that they be allowed to possess religious literature "on an equal basis" with other religious practitioners at the institution—are already allowed at IMSI. Accordingly, we need not address them here.

proved and having cards on their person or in their property, shall be pre-approved for the detention or administative [sic] segregation items.

The general thrust of these demands is that Native American practitioners be allowed to create and operate a group that administers the Native American religion within IMSI. However, to show that his rights under the RLUIPA were violated, a petitioner must first establish that the state's actions create a substantial burden on the exercise of his *religious beliefs.* 42 U.S.C. § 2000cc–2(b); *Hernandez v. Commissioner,* 490 U.S. 680, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989) (emphasis added). Under the statute, a "religious exercise" is "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc–5(7)(A). Here, Hyde has not shown how being allowed to form a group such as NAIL and being given the power to include and exclude members, among other things, is an exercise of his religion. Accordingly, RLUIPA is not implicated in these claims.

### b. Least restrictive means

Given that we have found there exists a compelling governmental interest in IDOC refusing to allow sweat lodge ceremonies, restricting the personal property of inmates, and disallowing smudging ceremonies, we now turn to the second operative question of our inquiry: whether the contested policies are the least restrictive means available to accomplish its compelling interests.

■ Under RLUIPA, prison officials bear the burden of establishing that the restriction challenged is the least restrictive alternative to achieve a compelling governmental interest. *Alvarez v. Hill,* 518 F.3d 1152, 1156 (9th Cir.2008); *Warsoldier v. Woodford,* 418 F.3d 989, 998 (9th Cir.2005). It has been held that prison officials cannot justify restrictions on religious exercise by simply citing to the need to maintain order and security in a prison. *Alvarez,* 518 F.3d at 1156; *Greene v. Solano County Jail,* 513 F.3d 982, 989 (9th Cir.2008). In general when considering whether a policy is the least restrictive means, a party must demon-strate that it has actually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice. *See United States v. Playboy Entm't Group, Inc.,* 529 U.S. 803, 824, 120 S.Ct. 1878, 1892, 146 L.Ed.2d 865, 886 (2000) (finding, in the context of a First Amendment challenge to speech restrictions, that "[a] court should not assume a plausible, less restrictive alternative would be ineffective"); *City of Richmond v. J.A. Croson,* 488 U.S. 469, 507, 109 S.Ct. 706, 729, 102 L.Ed.2d 854, 890 (1989) (holding that the city's minority set-aside program was not narrowly tailored in part because the city had not considered whether race-neutral measures would have achieved the government's interest); *Hunter ex rel. Brandt v. Regents of Univ. of Cal.,* 190 F.3d 1061, 1078 (9th Cir.1999) (concluding that the government "neglected to undertake any consideration—let alone serious, good faith consideration" of race-neutral alternatives). The Ninth Circuit Court of Appeals (conforming to the approach of other circuits) has applied this requirement in the context of a RLUIPA claim. *Alvarez,* 518 F.3d at 1156–57; *Greene,* 513 F.3d at 989; *Warsoldier,* 418 F.3d at 999 (noting, in the face of a RLUIPA challenge, that prison officials had not considered a means less restrictive than a universal requirement that inmates' hair be less than three inches long). *See also Spratt v. R.I. Dep't of Corrections,* 482 F.3d 33, 41 (1st Cir.2007); *Murphy v. Mo. Dep't of Corr.,* 372 F.3d 979, 989 (8th Cir.2004) ("It is not clear that MDOC seriously considered any other alternatives, nor were any explored before the district court.").

Despite this general consensus that a party must demonstrate it has taken into consideration and rejected less restrictive alternatives, in *Fowler,* 534 F.3d at 940, the Eighth Circuit Court of Appeals expounded on the limits that must be inherent in such an inquiry. As the court stated, "it would be a herculean burden to require prison administrators to refute every conceivable option in order to satisfy the least restrictive means prong of [RLUIPA]." The court continued:

... "[A] judge would be unimaginative indeed if he could not come up with something a little less 'drastic' or a little less

'restrictive' in almost any situation, and thereby enable himself to vote to strike [a regulation] down." *Illinois State Bd. Elec. v. Socialist Workers Party,* 440 U.S. 173, 99 S.Ct. 983, 59 L.Ed.2d 230 ... (1979) (Blackmun, J., concurring) (criticizing the least restrictive means test as a "slippery slope" of uncertainty). But such a draconian construction of RLUIPA's least restrictive means test would render federal judges "the primary arbiters of what constitutes the best solution to every religious accommodation problem" in state penal institutions. *Lovelace,* 472 F.3d at 215 (Wilkinson, J., dissenting). And, as we have seen, this would be inconsistent with congressional intent. *See Cutter,* 544 U.S. at 722–23, 125 S.Ct. at 2122–23, 161 L.Ed.2d at 1034–35....

We must remain mindful that *Cutter* counsels restraint in this realm. There, the Supreme Court repeatedly instructed us to provide "due deference to the experience and expertise of prison and jail administrators" in construing RLUIPA. *Id.* at 723, 125 S.Ct. at 2123, 161 L.Ed.2d at 1034.... Otherwise, "religious accommodation in the penological context threatens to become the tail that wags the dog. Absent due restraint, 'inmate requests for religious accommodations [may] become excessive, impose unjustified burdens on other institutionalized persons, or jeopardize the effective functioning of an institution.'" *Lovelace,* 472 F.3d at 217 (Wilkinson, J., dissenting) (quoting *Cutter,* 544 U.S. at 726, 125 S.Ct. at 2124, 161 L.Ed.2d at 1037 ....)

*Id.* at 940–41 (footnote omitted).

### 1. Sweat lodge ceremonies

▮▮ Warden Fisher testified at trial that there had been careful consideration before the sweat lodge was banned, but that officials concluded that it was simply too dangerous to operate in a maximum security setting. The Department therefore considered less restrictive alternatives. The district court concluded that complete disallowance of a sweat lodge was the least restrictive means given how the lodge was built, the abuses that occurred in the previous sweat lodge and the safety and security risks that accom-

panied allowing the inmates access to a sweat lodge. The court also discussed the alternatives made available to Hyde and his reactions to them:

The prison authorities have provided alternative facilities and means for Native American religious practitioners to worship at IMSI. As with other religions, rooms are available for conducting Native American religious ceremonies. Similarly, as has been provided other religious adherents, the prison has a Native American religious advisor to assist inmate practitioners. The advisor is a Native American practitioner himself.

These reasonable alternatives have been rejected by Hyde who insists on the secrecy of the sweat lodge and the use of dangerous items for the conduct of ceremonies. While the available room for worship is not a sweat lodge, ceremonies can be held by Native Americans and for Native Americans. They may not, however, use axes, fires, have total unobserved secrecy and only be available to inmates of Hyde's choosing. Ceremonies may be private and open to all Native American practitioners under the supervision of the prison's Native American religious advisor. Hyde has rejected this alternative location as well as the supervision of the Native American religious advisor. To follow Hyde's desires is more akin to letting the inmates run the prison than affording Native Americans the right to pursue their religion on an equivalent basis to other inmates and their religions....

We agree that IDOC's policy completely restricting the use of a sweat lodge is the least restrictive means of serving the compelling governmental interest of security and safety that we discussed above. In short, we do not see how IDOC could more narrowly tailor the prohibition without undermining the compelling interest that it promotes. An inmate using a sweat lodge is necessarily out of sight of prison staff and has access to potential weapons. Given the real and articulated dangers that we discussed above that are inherent in a maximum security setting such as IMSI, there appears to be no less restrictive means of maintaining security

while still allowing inmates to participate in sweat lodge ceremonies.

We do, however, recognize that while prison officials have said that Hyde may practice his religion in an alternate manner, they have required that to do so, the aid of an approved religious volunteer with expertise in the Native American religion must be present. The record demonstrates that although effort has been made, IMSI has been unable to find a Native American religion volunteer to serve at the institution. Five hundred religious sponsors volunteer at Idaho State Correctional Institution (ISCI) and thirty-five to forty sponsors volunteer at IMSI, but none of these volunteers sponsor the Native American religion. Chaplain Solts testified that he placed a $700 advertisement in a major Idaho newspaper to recruit a volunteer to facilitate Native American religious exercise at IMSI, but that advertisement did not generate a single response. At another time, a woman contacted Deputy Warden Miller about being a volunteer religious advisor to the Native American religion. IMSI officials rejected her offer because unaccompanied women were not allowed as religious advisors and her marriage to a Native American allegedly was insufficient background for the Native American religion advisor position. According to Deputy Warden Miller, IMSI wanted "an elder and someone who is accepted by the community standards as being a spiritual advisor."

Thus, the practical effect of IMSI's requirement is that Hyde and other Native American religion practitioners are denied the opportunity to practice any aspect of their religion within the facility. And while we are cognizant that having an outside volunteer who is established within the Native American religion would be ideal, we are unconvinced that such a measure is necessary for the safety and security of IMSI. Here, Hyde does not insist upon a religious advisor whose beliefs are completely congruent to his own, but rather that the IDOC not insist on the presence of an outside volunteer as a condition precedent to the practice of his religion. Thus, if an outside Native American religion volunteer cannot be procured, IMSI can assign either the chaplain or another staff member to the group and allow Hyde and other practitioners to practice their religion within the confines of our decision here under the supervision of that staff member.[9]

### 2. Smudging ceremony

■■■ Hyde argues that even if the prohibition of smudging advances a compelling state interest, a complete ban on the practice is not the least restrictive means of advancing that interest.

In a 1998 grievance, Hyde explained that smudging "is the act of praying. I can not pray without smudging. Many people pray differently...." Inmate Charles Doan, an adherent to Native American religion, testified at the hearing on Hyde's *habeas corpus* petition that ninety-eight percent of the time prayer is effectuated by smudging and that group prayer is a general mandate of Native American religion. In other words, prayers without smudging are "technically possible but effectively miserable." *See Whitney v. Brown*, 882 F.2d 1068, 1074 (6th Cir.1989) (holding unconstitutional a ban on the Passover Seder celebration because "an individual's solo seder" is "a very miserable seder").

In *Sample*, a federal district court observed that

---

9. In his testimony, Warden Fisher stated, when asked whether there was any legal reason why his staff was not assigned to facilitate religious activities, that it was his belief that having a staff member supervise Native American practitioners in their religious practice was "a separation issue." He continued, saying that he "wouldn't feel comfortable with my staff trying to take over those religions...." However, given the scope of our order here, there is no Establishment Clause issue. We merely order that a staff member be provided to *supervise* the inmates while they practice their religion—not to lead or participate in the religious practice. The provision of paid prison chaplains has been found not to violate the Establishment Clause. *See Cutter v. Wilkinson*, 544 U.S. 709, 725, 125 S.Ct. 2113, 2124, 161 L.Ed.2d 1020, 1036 (2005); *School District of Abington Township v. Schempp*, 374 U.S. 203, 297, 83 S.Ct. 1560, 1610, 10 L.Ed.2d 844, 900 (1963); *Duffy v. State Personnel Bd.*, 232 Cal. App.3d 1, 12, 283 Cal.Rptr. 622 (1991). Thus, IMSI also has the alternative of assigning a paid chaplain to supervise the allowed Native American religion practices without acting in contravention of the Establishment Clause.

Three themes are central to Native American religious life: purification, offering, and vision. The ceremonial manifestations of these three aspects of Native American religious life are of such a character that the deprivation of one (for whatever reason) makes more critical, from a spiritual standpoint, the need to participate in another. Thus, for Native Americans who are unable to participate in a sweat lodge ceremony (a purification ritual) ... participation in a pipe ceremony (an offering rite) becomes more important.

*Sample v. Borg,* 675 F.Supp. 574, 577 (E.D.Cal.1987) (vacated on other grounds). The court ordered the defendants to permit pipe ceremonies, tobacco ties, and a headband because prison officials had *totally* denied the plaintiff's "right to celebrate various religious rites and possess various religious artifacts, all of which are deeply rooted in the Native American religious experience." *Id.* at 577, 582.

In this case, Warden Fisher testified that the reasons for disallowing all smudging are limited staff resources, his objection to allowing Native American religion practitioners to smoke in a tobacco and smoke-free institution, the objection that other inmates may have to the presence of smoke, and his concern with inmates having control of fire and other requisite smudging ceremony implements. We conclude that the Department has not carried its burden to demonstrate that a complete ban on smudging ceremonies is the least restrictive means of furthering its compelling interest of safety at IMSI.

First, it does not appear from the record that IMSI considered limiting the frequency of smudging ceremonies as a means of meeting its interests in safety and security in the face of meager staff resources. Additionally, in regard to concerns about allowing any kind of smoking at a tobacco-free institution, we do not find IMSI's rationale to be convincing. In *Roles,* 138 Idaho 412, 64 P.3d 338, we determined that under FERPA, IDOC's tobacco-free policy was the least restrictive means to advance a compelling governmental interest, with one of the reasons being that the policy did not prevent the burning of non-tobacco elements needed in the practice of Native American religion. Thus, our reasoning for upholding IDOC's tobacco ban does not extend to a ban on smoking non-tobacco elements in a religious setting. Relatedly, concerns over the impact of smoke on other inmates and the presence of fire inside the institution could be significantly addressed by simply directing that the ceremonies be conducted outside in the exercise yard. Although IMSI officials expressed concern about the presence of fire and smoke, testimony indicated that the fire marshal was never consulted about the possible alternative of conducting the ceremony outdoors. *See e.g., Skenandore v. Endicott,* 2006 WL 2587545 (E.D.Wis.) (disallowing smudging in cells, but allowing it outside); *Greybuffalo v. Frank,* 2003 WL 23211615 (W.D.Wis.) (holding that disallowing smudging in one's cell was not a substantial burden where smudging was allowed elsewhere).

Finally, in regard to concerns about safety and the possession of the elements necessary to conduct a smudging ceremony, a less restrictive alternative that still addresses safety concerns would be to dictate that instead of allowing the elements to be possessed by inmates as their personal property, they be retained by the overseeing chaplain or IMSI staff member and the inmates not have access to the elements except during the designated smudging ceremonies and while under supervision by a chaplain or other staff. Warden Fisher specifically testified that he would be amenable to additional items being brought into the facility (i.e., music instruments, feathers, etc.) by religious volunteers. Thus, least restrictive means could entail Native American religion practitioners having access to the necessary items for smudging ceremonies, but only under supervision and at designated times and in designated areas. Unlike sweat lodge ceremonies, the IDOC has *not demonstrated that no manner of* conducting smudging ceremonies can be safely accommodated by IMSI. Thus, we hold the IDOC has not carried its burden to show that *completely* disallowing smudging ceremonies is necessary to achieve IMSI's interest in safety and security at the institution.

### 3. Possession of religious objects

 The district court also held that IMSI demonstrated that its regulation of inmates' personal property was the least restrictive means of furthering the compelling governmental interest of safety and security at the maximum security institution. The court indicated its finding that safety and security at IMSI required a no less restrictive personal property policy and discussed the alternatives available to Hyde, including the fact that Native American practitioners are allowed use of prison rooms for religious services as well as use of "appropriate religious objects purchased through reputable suppliers" approved by the prison chaplain, in consultation with the Native American religious advisor. This procedure, the court explained, allows property that inmates acquire for religious use to be reviewed by a religious advisor as opposed to correctional officials; which thereby allows inmates to acquire items for religious practice while still allowing the government to ensure prison safety and security.

The court also indicated that IMSI policy allows that some religious items that prisoners are not allowed to keep as personal property in their cells may be stored in prison facilities to be used during religious ceremonies—including Native American ceremonies. The court noted that Hyde has "declined to take advantage of IMSI rules and alternatives afforded to allow him to pursue his religious beliefs." He has rejected, the court continued, "any and all opportunities to practice his Native American religion where he does not serve as the final arbiter over who may join his practice and what items of property may be possessed in its furtherance." The court further found that Hyde had refused to work with IMSI's Native American religious advisor and has not offered any alternatives for pursuit of his religious beliefs and practices aside from full access to the items which he listed in his initial petition.

Relative to the religious property policy, Warden Fisher testified that when he first became the warden at IMSI

[t]here were different levels of property for different faiths. Staff were confused. Everyone was fighting this battle to some degree. So what we came up with was that, for the more conventional or recognized—or whatever—faiths, you had volunteers, experts from the community, that would come in; and they would facilitate those religious services happening. And they would be the ones who would determine whether someone is sincere in their belief. We didn't want to get into that. It's improper for me to determine whether someone is a sincere Catholic, a sincere Mormon, a sincere Hindu or anything. So the volunteers also have other benefits. They tie us into the community. They build our community support. They can help inmates because they are interacting with the community every day. They are successful, productive citizens; and that can hopefully feed off with inmates. That's the way we handle the conventional ones.

And for the non-conventional folks, what we determined to do was to come up with a standard property allowance which we felt would accommodate folks.... [W]hen we are talking about the pouch, the headband, the beads, those kind of things are allowed in that property allowance as a standard for the entire Department. We were not going to get into whether someone should have one or two or shouldn't have those. They could have whatever they want of those.

It is undisputed that the prison personal property policy creates alternatives for the possession of some religious objects. When establishing the policy, the IDOC considered the need to treat different religious groups fairly by allocating similar amounts of religious property to each faith group, knowing that some faiths use very few property items in their practice while others use many items. In fact, Fisher explicitly identified several objects on the list of approved religious property that were specifically included to accommodate Native American religion practitioners.

We recognize that standard personal property policy is integral to institutional security and efficiency and that a line has to be drawn somewhere as to what items are allowed. Accordingly, we conclude the policy imple-

mented at IMSI, which takes into account the needs of various religious practitioners—including those practicing the Native American religion—is a legitimate and the least restrictive means of furthering a compelling governmental interest. However, as we have described above, the elements necessary for conducting smudging ceremonies are to be made available to participating inmates, but they may be kept by the chaplain or other IMSI supervisor when not in use for this purpose, so as to retain the integrity and efficacy of the personal property policy.

### 2. FERPA

■ Hyde also advances his arguments under Idaho's Free Exercise of Religion Protected Act (FERPA), Idaho Code §§ 73–401, et seq., which became effective in 2001. The operative provision of the Act states, in relevant part:

> 73–402. Free exercise of religion protected.
>
> (1) Free exercise of religion is a fundamental right that applies in this state, even if laws, rules or other government actions are facially neutral.
>
> (2) Except as provided in subsection (3) of this section, government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability.
>
> (3) Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person is both:
>
> > (a) Essential to further a compelling governmental interest;
> >
> > (b) The least restrictive means of furthering that compelling governmental interest.
>
> . . . .
>
> (5) In this section, the term "substantially burden" is intended solely to ensure that this chapter is not triggered by trivial, technical or de minimus infractions.

Additionally, the Act provides the following definitions in I.C. § 73–401:

> (1) "Demonstrates" means meets the burdens of going forward with evidence, and

persuasion under the standard of clear and convincing evidence.

> (2) "Exercise of religion" means the ability to act in a manner substantially motivated by a religious belief, whether or not the exercise is compulsory or central to a larger system of religious belief.

FERPA uses identical language as RLUIPA in requiring that a burden on religion must further "a compelling governmental interest" and that it be the "least restrictive means" of furthering that interest. Because there is no indication that the two statutes should be applied differently, having addressed the merits of Hyde's arguments under RLUIPA, we need not do it again under FERPA; the result is the same.

### C. Constitutional Claims

By prohibiting government from imposing any substantial burden on an inmate's religious exercise unless the burden is justified by a compelling, and not just a legitimate, governmental interest, RLUIPA accords greater protection to an inmate than the Free Exercise Clause of both the Idaho and federal constitutions. *See Smith v. Allen,* 502 F.3d 1255 (11th Cir.2007); *Guru Nanak Sikh Society of Yuba City v. County of Sutter,* 326 F.Supp.2d 1140, 1162 (E.D.Cal.2003), *affirmed by* 456 F.3d 978, (9th Cir.2006) (deciding that because petitioners' claims succeed under RLUIPA, there was no need to consider whether they succeed under the lower level of scrutiny). *See also Communist Party of Indiana v. Whitcomb,* 414 U.S. 441, 452 n. 1, 94 S.Ct. 656, 663, n. 1, 38 L.Ed.2d 635, 644, n. 1 (1974) (holding that constitutional issues need not be decided where narrower grounds exist for according relief). Thus, where we have addressed Hyde's claims under the RLUIPA standard, we need not address his constitutional claims as we have already applied the higher RLUIPA standard.

### III.

### CONCLUSION

We conclude that Hyde has shown no error in the district court's procedure on remand. The district court correctly ruled that

IMSI's complete ban on sweat lodge ceremonies and implementation of a personal property policy does not violate Hyde's constitutional rights or those conferred upon him by RLUIPA and FERPA. However, we conclude that IDOC has not demonstrated that *completely* banning smudging ceremonies at IMSI is the least restrictive means of furthering the compelling governmental interest of safety and security at the institution.

Accordingly, the order of the district court denying Hyde's petition for writ of *habeas corpus* is affirmed in part and reversed in part.

Chief Judge LANSING and Judge PERRY concur.